Gerald Christopher ZULIANI, Appellant,

v.

The STATE of Texas, Appellee.

No. 03–92–00110–CR.

Court of Appeals of Texas,
Austin.

July 12, 1995.

Rehearing Overruled Aug. 16, 1995.

Christopher P. Morgan, Austin, for appellant.

Ronald Earle, Dist. Atty., Philip A. Nelson, Jr., Asst. Dist. Atty., Austin, for appellee.

Before ABOUSSIE, B.A. SMITH and ONION *, JJ.

ONION, Justice (Assigned).

■ Appellant Gerald Christopher Zuliani was charged by indictment with intentionally and knowingly causing serious bodily injury to a child younger than fourteen years. *See* Act of May 29, 1989, 71st Leg., R.S., ch. 357, § 1, 1989 Tex.Gen.Laws 1441 (Tex.Penal Code § 22.04(a), since amended) (hereinafter "former section 22.04").[1] Under the evidence and the trial court's jury charge, the jury found appellant guilty of recklessly[2] causing serious bodily injury to a child. Because the jury found the offense was committed with the culpable mental state of "recklessly," the offense became a third degree felony rather than a first degree felony as originally charged. *Id.*; former section 22.04(e), since amended. The jury assessed punishment at ten years' imprisonment and a fine of $10,-000.

The conviction resulted from appellant's second trial on the indictment. The first trial ended in a mistrial after it was discovered, by virtue of a note from the jury, that certain items which had not been introduced into evidence, including appellant's confession, had been inadvertently sent to the jury room with the exhibits properly admitted into evidence.

Appellant advances thirty-four points of error, some of which involve serious legal questions. Appellant contends, among other things, that the trial court erred in overruling the motion to suppress his taped confession which he contends was obtained by coercion, threats, physical violence, and egregious police action. He claims further that at the time of the confession he was being illegally restrained by virtue of an unlawful warrantless arrest. Appellant urges that the admission of the illegally obtained confession into evidence before the jury was reversible error.

In addition, appellant contends that he was unfairly prejudiced when his former girlfriend testified to extraneous offenses over timely objection. The witness was allowed to detail various acts of violence committed on her by appellant over a two-year period. Appellant urges that he was tried for being a criminal generally rather than on the pending charge. Appellant also argues that his second trial violated the double jeopardy provisions of both the federal and state constitutions. In light of the trial court record before us, we have no recourse under the law but to reverse the conviction due to the errors in overruling the motion to suppress the confession and in improperly admitting extraneous offenses into evidence. Therefore, we need not reach the other points of error except the double jeopardy issue.

The sufficiency of the evidence to sustain the conviction is not challenged. The record shows that the two-year-old victim was

---

* Before John F. Onion, Jr., Presiding Judge (retired), Court of Criminal Appeals, sitting by assignment. *See* Tex.Gov't Code Ann. § 74.003(b) (West 1988).

1. Now see Tex.Penal Code Ann. § 22.04(a) (West 1994), effective September 1, 1994.

2. "Recklessly" is a lesser culpable mental state of "intentionally" and "knowingly" as alleged in the indictment. *See Rocha v. State*, 648 S.W.2d 298, 304 (Tex.Crim.App.1982); *Tissier v. State*, 792 S.W.2d 120 (Tex.App.—Houston [1st Dist.] 1990, pet. ref'd). The trial court submitted all three culpable mental states to the jury.

Christopher Wohlers, the natural child of Robbi Boutwell Zuliani (hereinafter Boutwell)[3] by a previous marriage. Appellant and Boutwell were married less than a month before the victim's death on January 2, 1990. Boutwell and her two children had lived with appellant several weeks before the marriage. In the late evening of January 2, 1990, the victim was rushed by E.M.S. from the Zuliani home to Brackenridge Hospital. Emergency personnel were informed that there had been an accidental drowning. A clinical diagnosis at the hospital indicated a closed head injury and the possibility of child abuse. Drowning was ruled out as a cause of the injuries. The child was placed on life support equipment, but later died. Contusions of various colors were observed on the body. The autopsy report showed blunt trauma to the head and that death resulted from a bilateral subdural hemorrhage with marked edema of the brain.

The State offered, *inter alia*, appellant's confession, Boutwell's testimony about appellant's actions toward the child on the night in question and about injuries suffered by the child on other occasions when he had been alone with appellant, and the testimony of a jail counselor that he overheard appellant's telephone conversation with his grandmother in which he expressed sorrow for having hurt the child.

## THE CONFESSION

In his first three points of error, appellant contends that the trial court erred in overruling his pretrial motion to suppress his confession because it was not shown to have been voluntarily given and was inadmissible under the Fifth and Fourteenth Amendments to the United States Constitution, article I, sections 10 and 19 of the Texas Constitution and articles 38.21 and 38.22 of the Texas Code of Criminal Procedure. U.S. Const.Amends. V, XIV; Tex. Const. arts. 10 & 19; Tex.Code Crim.Proc.Ann. arts. 38.21, 38.22 (West 1979 & Supp.1995).

In his motion to suppress the confession, appellant contended that the confession was

the result of custodial interrogation following an illegal arrest and that it was obtained "by coercion and threats by law enforcement personnel without the proper warnings of his constitutional and statutory rights after he had attempted to terminate the questioning." At the suppression hearing (conducted prior to the first trial), it was shown that Sergeant Bruce Boardman of the Austin Police Department received a telephone call and then assigned Sergeants Michael Huckabay and Hector Polanco to investigate a possible child abuse case. Upon arrival at Brackenridge Hospital, Huckabay and Polanco viewed the injured child, who was in critical condition, and were informed by Dr. Jaffe that the injuries were not the result of a drowning. The officers went to the hospital's family room where they encountered appellant, Boutwell, appellant's mother, a neighbor, and a social worker. Since appellant and Boutwell were the only adults present at the time of the injuries, the officers requested that they come to the police station to give statements. They agreed. Polanco testified that at this point, the officers did not have sufficient information about the cause of the injuries to view appellant and Boutwell as suspects or to conclude that a criminal act had occurred.

Upon arrival at the police station at about 1:00 a.m. on January 3, 1990, Boutwell was placed in one interview room and appellant in another. Sergeants Huckabay and Polanco commenced their investigation by interviewing Boutwell. At first, she persisted in repeating the drowning story. When her interrogators said that they did not believe her, Boutwell began to yell and scream at the officers. At this point, Sergeant Mark Rush was asked by the officers involved to move appellant so that he could not hear Boutwell. Rush placed appellant in a lobby near the elevators. Later, Boutwell incriminated appellant, accusing him of causing the injuries to her two-year-old son.

At about 3:00 a.m., Huckabay went to the lobby area and returned appellant to an interview room. There, Huckabay and Polanco

---

**3.** By the time of the second trial, Robbi had obtained a divorce and had resumed using the Boutwell name.

reintroduced themselves and asked appellant what had happened to the child. Appellant repeated the drowning story. Huckabay told appellant "to think about it, get it straight." The officers left the room. Sometime later, Huckabay returned to the room where appellant was seated. Sergeant Huckabay administered the *Miranda*[4] warnings to appellant and informed him that Boutwell was now blaming appellant for the child's injuries. Appellant maintained his innocence, although Huckabay told him that the child's injuries were not consistent with appellant's story and that appellant was lying. Huckabay reported that appellant became angry and began debating with him; he also recalled that appellant had a smirk on his face. Huckabay lost his composure and yelled at appellant, "[T]o hell with you." When Huckabay got up to leave, appellant asked the officer to wait, but Huckabay told appellant that he did not "want to hear what you've got to say."

Sergeant Boardman, who was still working on another case, heard the yelling and went to the interview room. As Huckabay opened the door to leave, appellant asked if he could talk to Boardman. The officer entered the room and shut the door. Appellant continued to protest his innocence. Boardman explained that the child had not drowned, that there was a subdural hematoma, and that the child was now brain dead. Boardman also informed appellant that the police knew the victim had been admitted to the hospital two or three weeks earlier. He rejected each explanation appellant made. The interrogation continued. Boardman described appellant's attitude and demeanor as being inappropriate under the circumstances; he was cocky, unfeeling, uncaring, and had a smirk on his face. When appellant stated that Boardman was saying the same things as Huckabay, Boardman got up to leave. Before leaving, Boardman, a weightlifter, suddenly grabbed appellant by the lapels of his jacket. Boardman described what happened next:

> I shoved him against the wall and I told him that if he didn't take that shit-eating grin off his face, that I was going to pull his head off and shit down his throat. I

then told him that he was—several different things about what I thought about him. Then I asked how it felt—'How do you think little Christopher felt to have someone your size throwing him around?' I said 'How does it feel to be scared?'

Boardman denied that his motive was to obtain a statement. He claimed that he only wished to get appellant's "attention" and change his "attitude" towards the investigation. He thought that appellant "was more stunned than anything" about what happened. The record further reflects on cross examination:

> [DEFENSE COUNSEL]: In retrospect you were trying to intimidate him.
>
> A: In retrospect, I was trying to get his attention, make him aware that we weren't talking about a shop-lifting case and we weren't talking about going out here an [sic] committing a burglary; we were talking about the murder of a child.
>
> Q: And you threatened him?
>
> A: No sir. I promised him.
>
> .    .    .    .    .
>
> Q: But what you were conveying to him was that you were promising physical harm?
>
> A: Yes sir.

Huckabay, who was in an interview room with Boutwell across the hall, heard Boardman "being pretty loud." Huckabay also heard "thumps" and "rumbling on the wall." Huckabay went to the room in question and opened the door. He saw that Boardman had appellant "up against the wall with his feet off the ground." Boardman was yelling and Huckabay heard the statement that Boardman acknowledged making. As Boardman was leaving the room, Huckabay heard Boardman tell appellant, "I don't need anything from you. You can leave. I don't care. I don't have to have you." Huckabay heard appellant respond: "Well, if you don't believe me, don't believe me, but I didn't do it. All I can do is tell you the truth. I don't know what you want me to do." At least, Huckabay thought it was "something to that effect."

4. *See Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

As Boardman left,[5] Huckabay entered the room and resumed the interrogation. Huckabay noted that appellant did not complain that Boardman had injured or hurt him. Huckabay apologized for his own previous conduct, told appellant that appellant was "probably a nice guy" who had made a mistake, that appellant really did not mean to hurt the child, that things happened that caused appellant to "lose it," that appellant was still a salvageable human being who, if he hurt the child, "needed to get it off his chest." Appellant again urged his innocence. The interrogation continued. Fifteen or twenty minutes later, Boardman returned and asked if appellant thought that he deserved what Boardman had done to him. Appellant was indignant and replied: "No, I don't think you deserved to do that to me." Boardman responded: "Well, that's fine. Do you think little Christopher deserved what you did to him?" Appellant broke down and began crying. Boardman left the room and had no further contact with appellant.

Huckabay continued the interrogation after Boardman left. According to Huckabay, appellant did not seem afraid of Boardman. After some time, appellant began to cry and admitted orally that he had injured the child on various occasions and on the fatal night. Appellant then indicated that he would give a taped statement. Appellant was again given the *Miranda* warnings and those required by statute. Tex.Code Crim.Proc.Ann. art. 38.22, § 2 (West 1979). Appellant stated that he understood his rights; he did not request an attorney. He signed a card acknowledging the warnings and waiving his rights. At 5:25 a.m., the officers made an electronic record of appellant's confession. It appears that all the requirements of section 3 of article 38.22 were met. *See id.* § 3. The taping concluded about 6:00 a.m. on January 3, 1990. A complaint was then filed, and appellant was formally arrested and jailed. At about 9:30 a.m. appellant was taken before a magistrate and given the magistrate's warnings.

In its findings of fact and conclusions of law, the trial court found that the electroni-

cally recorded confession was freely and voluntarily made by the twenty-three-year-old appellant after he had been duly warned of his rights under *Miranda* and article 38.22, and had affirmatively waived those rights. The trial court further found that the taped confession met the statutory requirements for electronically recorded statements. The trial court also found appellant was not induced to make the confession by "any compulsion, threats, promises or persuasion." In its specific findings, the trial court concluded that the incident with Sergeant Boardman "was brief, was not intended to secure a statement from the defendant, had no affect [sic] on the defendant's demeanor or attitude and involved no physical injury to the defendant." Moreover, the trial court found that Sergeant Boardman was not present during the final interrogation resulting in the confession, and that the incident between Boardman and appellant was disconnected with and unrelated to the confession. The trial court concluded that the confession was admissible in evidence as a matter of law.[6]

In a suppression hearing, the trial court is the sole trier of fact and judge of the credibility of the witnesses and the weight to be given their testimony. *Romero v. State*, 800 S.W.2d 539, 543 (Tex.Crim.App.1990). The trial court may accept or reject all or any part of a witness's testimony. *Taylor v. State*, 604 S.W.2d 175, 177 (Tex.Crim.App. 1980). In reviewing the trial court's decision, an appellate court does not engage in its own factual review; it determines only whether the record supports the trial court's fact findings. *Romero*, 800 S.W.2d at 543. If the trial court's fact findings are supported by the record, an appellate court is not at liberty to disturb the findings absent an abuse of discretion. *Cantu v. State*, 817 S.W.2d 74, 77 (Tex.Crim.App.1991); *Dancy v. State*, 728 S.W.2d 772, 772 (Tex.Crim.App.), *cert. denied*, 484 U.S. 975, 108 S.Ct. 485, 98 L.Ed.2d 484 (1987). On appellate review, the court normally will address only the question of whether the trial court properly applied the law to the facts. *Romero*, 800 S.W.2d at 543;

---

5. The record reflects that Boardman was with appellant in the interview room for approximately twenty minutes.

6. The State, however, chose not to offer the confession into evidence at appellant's first trial.

*Vargas v. State,* 852 S.W.2d 43, 44 (Tex. App.—El Paso 1993, no pet.).

▮ The Texas Code of Criminal Procedure expressly allows the statement of an accused to be used against him if it appears that the statement was freely and voluntarily made without compulsion or persuasion. Tex.Code Crim.Proc.Ann. arts. 38.21, 38.22 (West 1979). Apart from the statutory requirements, the admissibility of a confession is contingent on the accused being accorded "due course of the law of the land." Tex. Const. art. I, § 19; *Collins v. State,* 171 Tex.Crim. 585, 352 S.W.2d 841, 843 (App. 1961), *cert. denied,* 369 U.S. 881, 82 S.Ct. 1152, 8 L.Ed.2d 283 (1962); *Faulkner v. State,* 193 S.W.2d 217 (Tex.Crim.App.1946). Furthermore, a confession must not only meet state law requirements, it must not be taken under circumstances condemned by the decisions of the United States Supreme Court as violative of the Due Process Clause of the Fourteenth Amendment to the United States Constitution. *Collins,* 352 S.W.2d at 843; *Faulkner,* 193 S.W.2d at 217.

▮ A confession obtained in a manner that violates the code or the due process provisions of the federal or state constitutions is not admissible. *See* 24 Tex.Jur.3d *Criminal Law* § 3073, at 264–65 (1982). And as noted in *Collins,* if the Court of Criminal Appeals is convinced that a confession is inadmissible as a matter of law under the holdings of the United States Supreme Court, "We do not hesitate to so hold." *Collins,* 352 S.W.2d at 843; *see also Golemon v. State,* 247 S.W.2d 119, 121 (Tex.Crim.App.), *cert. denied,* 344 U.S. 847, 73 S.Ct. 60, 97 L.Ed. 659 (1952); *Prince v. State,* 155 Tex. Crim. 108, 231 S.W.2d 419, 421 (App.1950).

▮ The United States Supreme Court has long held that certain interrogation techniques, either in isolation or as applied to the unique characteristics of a particular suspect, are so offensive to a civilized system of justice that they must be condemned under the due process clause of the Fourteenth Amendment. *Miller v. Fenton,* 474 U.S. 104, 109, 106 S.Ct. 445, 449, 88 L.Ed.2d 405 (1985) (citing *Brown v. Mississippi,* 297 U.S. 278, 56 S.Ct. 461, 80 L.Ed. 682 (1936), as the wellspring of this notion). The Supreme Court began to rely on the due process clause as a federal constitutional basis to reject confessions when state criminal cases were first reviewed. Under the traditional allocation of responsibility for criminal law administration, a federal court was not to interfere with state judicial activities merely because a state failed to follow common-law evidentiary or procedural rules. Only if a federal constitutional provision was violated could a federal court intervene.

▮ *Brown* held that the use of involuntary confessions in state proceedings violated Brown's due process rights under the Fourteenth Amendment. In *Brown,* the coerciveness of the police tactics was not in doubt. The confession was clearly exacted by torture or physical violence. *Id.* 297 U.S. at 281–82, 56 S.Ct. at 462–63. Cases from the United States Supreme Court, however, have made clear over the years that a finding of coercion need not depend upon actual violence by a governmental agent; a credible threat is sufficient. *Arizona v. Fulminante,* 499 U.S. 279, 287, 111 S.Ct. 1246, 1253, 113 L.Ed.2d 302 (1991). As the Court has said: "Coercion can be mental as well as physical and.... the blood of the accused is not the only hallmark of an unconstitutional inquisition." *Blackburn v. Alabama,* 361 U.S. 199, 206, 80 S.Ct. 274, 279, 4 L.Ed.2d 242 (1966); *see also Reck v. Pate,* 367 U.S. 433, 440–41, 81 S.Ct. 1541, 1546, 6 L.Ed.2d 948 (1961); *Rogers v. Richmond,* 365 U.S. 534, 540, 81 S.Ct. 735, 739, 5 L.Ed.2d 760 (1961); *Payne v. Arkansas,* 356 U.S. 560, 561, 78 S.Ct. 844, 846–47, 2 L.Ed.2d 975 (1958). It is axiomatic that a defendant in a criminal case is deprived of due process of law if his conviction is founded, in whole or in part, upon an involuntary confession without regard to the truth or falsity of the confession, *Rogers,* 365 U.S. at 543–44, 81 S.Ct. at 740–41, even though there is ample evidence aside from the confession to support the conviction. *Jackson v. Denno,* 378 U.S. 368, 376, 84 S.Ct. 1774, 1780, 12 L.Ed.2d 908 (1964).

▮ Likewise, Texas courts have held confessions inadmissible as a matter of law when the uncontradicted evidence has shown they were obtained by coercion, threats or fear.

*See, e.g. Sinegal v. State,* 582 S.W.2d 135, 137 (Tex.Crim.App.1979); *Sherman v. State,* 532 S.W.2d 634, 636 (Tex.Crim.App.1976); *Farr v. State,* 519 S.W.2d 876, 880 (Tex.Crim.App. 1975); *Tovar v. State,* 709 S.W.2d 25, 29 (Tex.App.—Corpus Christi 1986, no pet.).

■ The "totality of the circumstances" is to be examined to determine whether a confession is voluntary. *Fulminante,* 499 U.S. at 285, 111 S.Ct. at 1251; *Schneckloth v. Bustamonte,* 412 U.S. 218, 226, 93 S.Ct. 2041, 2047, 36 L.Ed.2d 854 (1973); *Farr,* 519 S.W.2d at 880. The State has the burden to prove the voluntariness of a confession. *Gentry v. State,* 770 S.W.2d 780, 789 (Tex. Crim.App.1988), *cert. denied,* 490 U.S. 1102, 109 S.Ct. 2458, 104 L.Ed.2d 1013 (1989). It must satisfactorily negate the accused's allegations of coercion in order to satisfy its burden of proof. *Farr,* 519 S.W.2d at 880; *Garcia v. State,* 829 S.W.2d 830, 833 (Tex. App.—Dallas 1992, pet. ref'd). Under the "totality of the circumstances" test, "the burden of proving voluntariness after flagrant police misconduct is, properly, substantial." *United States v. Jenkins,* 938 F.2d 934, 940 (9th Cir.1991).

■ Whenever an accused's testimony of alleged coercion is undisputed, the resulting confession is inadmissible as a matter of law. *See, e.g. Sinegal,* 582 S.W.2d at 137; *Farr,* 519 S.W.2d at 880. Although appellant did not testify, the uncontradicted evidence in the instant case of the coercive acts was elicited from the State's own witnesses, principally the officers in question.

■ The question to be confronted in each case is whether the accused's will was overborne when he confessed. *Fulminante,* 499 U.S. at 286 n. 2, 111 S.Ct. at 1252 n. 2; 23 C.J.S., *Criminal Law* § 893 (1989). The confession must be the product of an essentially free and unconstrained choice by its maker. *Fulminante,* 499 U.S. at 303, 304, 111 S.Ct. at 1261, 1262 (Rehnquist, C.J. dissenting). In some cases, the need for such an individual calculus is obviated by the egregiousness of the police conduct. *See United States v. Jenkins,* 938 F.2d 934, 938 (9th Cir.1991). Confessions accompanied by physical violence wrought by law enforce-

ment personnel have been considered *per se* inadmissible. *Stein v. New York,* 346 U.S. 156, 182, 73 S.Ct. 1077, 1091–92, 97 L.Ed. 1522 (1953), *overruled on other grounds, Jackson v. Denno,* 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964); *Cooper v. Scroggy,* 845 F.2d 1385 (6th Cir.1988) (holding that use of physical force by interrogators creates heavy presumption, if not *per se* rule, that there has been a violation of due process); *Miller v. Fenton,* 796 F.2d 598, 604 (3d Cir.1986).

■ Confessions accompanied by physical violence are presumed involuntary both because of their unreliability and because of the great likelihood that the use or threatened use of violence overbears a suspect's will. *Jenkins,* 938 F.2d at 938. As *Stein* noted:

> Physical violence or threat of it by the custodian of a prisoner during detention serves no lawful purpose, invalidates confessions that otherwise would be convincing, and is universally condemned by the law. When present, there is no need to weigh or measure its effects on the will of the individual victim. The tendency of the innocent, as well as the guilty, to risk remote results of a false confession rather than suffer immediate pain is so strong that judges long ago found it necessary to guard against miscarriages of justice by treating any confession made concurrently with torture or threat of brutality as too untrustworthy to be received as evidence of guilt.

*Stein,* 346 U.S. at 182, 73 S.Ct. at 1091–92.

Although *Stein* was overruled by *Denno* on other grounds, *Denno* did not repudiate *Stein's* special rule for confessions induced by police brutality. *See Jenkins,* 938 F.2d at 938. In fact, the United States Supreme Court in *Denno* explained that:

> It is now inescapably clear that the Fourteenth Amendment forbids the use of involuntary confessions not only because of the probable unreliability of confessions that are obtained in a manner deemed coercive, but also because of the "strongly felt attitude of our society that important human values are sacrificed where an agency of the government, in the course of

securing a conviction, wrings a confession out of an accused against his will." *Blackburn v. Alabama*, 361 U.S. 199, 206–07 [80 S.Ct. 274, 280, 4 L.Ed.2d 242 (1960) ], and because of "the deep-rooted feeling that the police must obey the law while enforcing the law; that in the end life and liberty can be as much endangered from illegal methods used to convict those thought to be criminals as from the actual criminals themselves." *Spano v. New York*, 360 U.S. 315, 320–21 [79 S.Ct. 1202, 1205–1206, 3 L.Ed.2d 1265 (1959) ].

*Denno,* 378 U.S. at 385–86, 84 S.Ct. at 1785.

■ It can be argued, after *Denno*, that *Stein* 's *per se* rule is limited to those confessions made concurrently with the physical violence. However, physical torture or violence usually produces a confession, not during the actual violence, but afterwards through fear of repetition. *See Jackson v. State*, 209 Md. 390, 121 A.2d 242, 244 (Ct. Spec.App.1956). A rule, however, that all confessions preceded by violence are inadmissible and incurable, regardless of ameliorative circumstances, is too rigid. *See Jenkins*, 938 F.2d at 938. It is nevertheless difficult to draw the line between those confessions properly considered coerced because of concurrent violence (in which a conclusive presumption that one's will is overborne is appropriate), and those sufficiently attenuated from such misconduct to justify application of the more lenient "totality of the circumstances" test. *Id.* An interruption in the stream of events between the initial coercion and the confession has been recognized as significant. *Barton v. State*, 605 S.W.2d 605, 607 (Tex.Crim.App.1980); *Berry v. State*, 582 S.W.2d 463, 465 (Tex.Crim.App. 1979); *Brooks v. State*, 130 Tex.Crim. 561, 95 S.W.2d 136, 138–39 (App.1936). A confession is not rendered inadmissible as a matter of law because of an assault upon the defendant which occurred prior to, disconnected with, and apparently unrelated to the subsequent confession. *Barton,* 605 S.W.2d at 607.

■ In this case, appellant was interrogated by Officer Huckabay, who admittedly lost his composure and began yelling as appellant continued to protest his innocence. Appellant invited Sergeant Boardman into the interview room following Huckabay's outburst. The interrogation continued with Boardman rejecting every explanation appellant made. At some point, Boardman threatened to pull appellant's head off, shoved him against the wall and lifted his feet off the ground. Boardman conceded that he was promising appellant physical harm. When Boardman left, Huckabay reentered the room with no break in the interrogation. This time Huckabay was composed and apologized for his earlier outbursts. After a few minutes, Boardman returned to ask if appellant thought that he deserved Boardman's rough treatment. This action alerted appellant to the fact that Boardman was still present, and it was then that he broke down and began crying. By then the twenty-three-year-old appellant had been awake some twenty hours. He had had no prior experience with the police. Within an hour or so, appellant gave an oral statement to Huckabay. Thereafter, the taped confession was taken from appellant. We find no interruption in the stream of events between the undisputed coercion by Sergeant Boardman and the taped confession taken by Huckabay. The police may take certain steps after physical abuse, such as removing the errant officer from the scene, assuring the suspect that he would no longer be harmed, and establishing via colloquy that his fears have been eliminated. Such curative measures might defuse a formerly coercive environment. *See, e.g. Cooper,* 845 F.2d at 1392. Here, there is no evidence that the police acted affirmatively to dissipate the coercive environment created by Boardman's actions and his "promise of harm" to appellant. *See Jenkins,* 938 F.2d at 940 n. 3.

As noted in *Brooks, Barton* and *Berry,* the Courts have held that an officer's assault does not render a confession inadmissible as a matter of law if the assault was prior to, disconnected with, and apparently unrelated to the subsequent confession. In *Brooks* and *Barton,* the confessions were taken the day after the alleged abuse at a different locale by an official not involved in the abusive behavior. In *Berry,* the assault and threats by a security guard and a police officer clearly had nothing to do with the confession

obtained an hour and a half later by another officer.

■ In the instant case, appellant was being interrogated about the offense when Boardman entered the picture. Boardman continued to question appellant about the injuries to the child and continued to reject appellant's claims of innocence. Boardman insisted that he was not attempting to induce a statement, but rather that his assault on appellant and his promise of harm were to change appellant's "attitude" towards the investigation, which was then centered on appellant. While Boardman's assault preceded the confession, the evidence does not show that it was disconnected with and apparently unrelated to the taking of the confession as in *Barton, Berry,* and *Brooks.* Appellant broke down emotionally and began crying upon Boardman's last visit to the interrogation room, shortly before he confessed. An individual calculus to determine whether the confession was the product of appellant's essentially free and unconstrained choice is unnecessary because of the egregiousness of the police conduct. *Jenkins,* 938 F.2d at 938. We hold that the confession, as a matter of law, was coerced and involuntary and taken in violation of the due process clause of the Fourteenth Amendment, and that the trial court erred in failing to suppress such a confession.

■ Until 1991, our conclusion that appellant's confession was coerced would have ended the matter with regard to a due process violation of the Fourteenth Amendment. A coerced confession would have been *per se* inadmissible, and its erroneous admission would have required automatic reversal. *Lego v. Twomey,* 404 U.S. 477, 483–87, 92 S.Ct. 619, 623–26, 30 L.Ed.2d 618 (1972); *Chapman v. California,* 386 U.S. 18, 23 n. 8, 87 S.Ct. 824, 828 n. 8, 17 L.Ed.2d 705 (1967); *Jackson v. Denno,* 378 U.S. 368, 385–86, 84 S.Ct. 1774, 1785–86, 12 L.Ed.2d 908 (1964). However, in *Fulminante,* 499 U.S. at 310, 111 S.Ct. at 1264–65, the Court held for the

first time that the admission of a coerced or involuntary confession is trial error and subject to a harmless error analysis.[7] Trial errors are contrasted with structural defects—that is, constitutional defects that affect "the framework within which the trial proceeds," such as the right to counsel and right to an impartial judge. *Fulminante,* 499 U.S. at 309–11, 111 S.Ct. at 1265. Structural defects can never be subject to a harmless error analysis, but the admission of "coerced" confessions and other "trial errors" do not have the same effect on the overall trial procedure as structural defects. *Id.* So long as other evidence is sufficient to convict a defendant, the admission of an "involuntary" confession, though unconstitutional, will no longer result in an automatic reversal of a conviction on appeal. *Id. Contra Payne v. Arkansas,* 356 U.S. 560, 568, 78 S.Ct. 844, 851, 2 L.Ed.2d 975 (1957).

■ One of the difficulties in applying *Fulminante* is that the United States Supreme Court "by the way of convenient shorthand" has used the terms "coerced confession" and "involuntary confession" interchangeably. *Fulminante,* 499 U.S. at 287 n. 3, 111 S.Ct. at 1252 n. 3; *Blackburn,* 361 U.S. at 207, 80 S.Ct. at 280. In *Fulminante,* the coercion or involuntariness was not the result of physical violence. In fact, Chief Justice Rehnquist noted the propriety of applying harmless error analysis "where there are no allegations of physical violence on behalf of the police." *Fulminante,* 499 U.S. at 311, 111 S.Ct. at 1266. The Supreme Court was not required to decide whether a harmless error analysis applies to violence-induced confessions. Due to increasing police sophistication in the modern era, in the usual case it is psychological rather than physical coercion that is the claimed abuse. *See Denno,* 378 U.S. at 389–90, 84 S.Ct. at 1787–88. The present case, however, is a throwback to earlier practices that combine physical and psychological coercion. *See Cooper,* 845 F.2d at 1390. Without clearer directions, we conclude that we must apply a harmless error

7. Justice White in dissent noted that the majority was abandoning the axiomatic proposition that a defendant in a criminal case is deprived of due process of law if his conviction is founded in whole or in part upon an involuntary confession without regard for the truth or falsity of the confession, even though there is ample evidence aside from the confession to support the convictions. 499 U.S. at 287–90, 111 S.Ct. at 1253–54.

analysis in light of *Fulminante*.[8] In this unusually structured opinion, Justice White wrote the majority opinion except for the extension of the harmless error analysis to coerced confessions, to which he dissented. He later applied the harmless error analysis for the court and found the admission of the confession harmful. *Fulminante*, 499 U.S. at 295–302, 111 S.Ct. at 1257–1261. As Justice White noted, a confession is like no other evidence as it comes from the actor himself and is the most probative and damaging evidence that can be admitted against a defendant. Confessions have such a profound impact on jurors that it may be justifiably doubted whether jurors can disregard them even if instructed to do so by the trial court. *Id.* at 295, 111 S.Ct. at 1257. A reviewing court is required to exercise extreme caution before determining that the admission of a coerced confession is harmless.

▬▬▬ Before a federal constitutional error can be held harmless, the court must be able to declare a belief that it did not contribute to the conviction and was harmless beyond a reasonable doubt. *Chapman*, 386 U.S. at 24, 87 S.Ct. at 828; *see also Fulminante*, 499 U.S. at 295, 111 S.Ct. at 1257. The Court of Criminal Appeals has stated that Rule 81(b)(2) of the Texas Rules of Appellate Procedure is the rhetorical and semantic equivalent of the federal harmless error standard announced in *Chapman*. *Mallory v. State*, 752 S.W.2d 566, 569–70 (Tex.Crim.App.1988). Rule 81(b)(2) provides:

> If the appellate record in a criminal case reveals error in the proceedings below, the appellate court shall reverse the judgment under review, unless the appellate court determines beyond a reasonable doubt that the error made no contribution to the conviction or to the punishment.

In discussing harm analysis under Rule 81(b)(2), it should be clear that we are not departing from the *Chapman* standard or applying some other harmless error standard to a federal constitutional error. In *Harris v. State*, 790 S.W.2d 568 (Tex.Crim.App. 1989), the Court of Criminal Appeals discussed the manner in which Rule 81(b)(2) is to be applied as follows:

> In summary, a reviewing court in applying the harmless error rule should not focus upon the propriety of the outcome of the trial. Instead, an appellate court should be concerned with the integrity of the process leading to the conviction. Consequently, the court should examine the source of the error, the nature of the error, whether or to what extent it was emphasized by the State, and its probable collateral implications. Further, the court should consider how much weight a juror would probably place upon the error. In addition, the Court must also determine whether declaring the error harmless would encourage the State to repeat it with impunity. In summary, the reviewing court should focus not on the weight of the other evidence of guilt, but rather on whether the error at issue might possibly have prejudiced the jurors' decision-making; it should ask not whether the jurors were able properly to apply law to facts in order to reach a verdict. Consequently, the reviewing court must focus upon the process and not on the result. In other words, a reviewing court must always examine whether the trial was an essentially fair one. If the error was of a magnitude that it disrupted the jurors' orderly evaluation of the evidence, no matter how overwhelming it might have been, then the conviction is tainted. Again, it is the effect of the error and not the other evidence

---

8. *See generally,* Hedieh Masheri & Victor J. De Marco, *True Confessions?: A Critique of Arizona v. Fulminante,* 21 Am.J.Crim.L. 241 (1994); Ted Botner, *Arizona v. Fulminante: Should Arkansas Courts Apply Harmless Error Analysis to Coerced Confessions,* 45 Ark.L.Rev. 995 (1993); Kenneth R. Kenkel, *Arizona v. Fulminante: Where's the Harm in Harmless Error?,* 81 Ky.L.J. 257 (1992–93); Jason Cenicola, *Arizona v. Fulminante: Accusation or Inquisition?,* 27 New Eng.L.Rev. 383 (1992); Dale v. Aronson, *Constitutional Law—*

*Harmless Constitutional Error Analysis—Are Coerced Confessions Fundamentally Different from Other Erroneously Admitted Evidence? Arizona v. Fulminante, 111 S.Ct. 1246 (1991),* 27 Land & Water L.Rev. 581 (1991); Clancy DuBos, Casenote *Arizona v. Fulminante—No Harm, No Foul?,* 37 Loyola L.Rev. 1029 (1992); William Gangl, *The Supreme Court and Coerced Confessions: Arizona v. Fulminante In Perspective,* 16 Harv.J.L. & Pub.Pol'y 493 (1993).

that must dictate the reviewing court's judgment.

*Id.* at 587–88.

■■■■ The error in the instant case was the admission of a confession coerced by physical violence and a promise of harm by a police officer. The erroneously admitted confession was emphasized by the State in both of its jury arguments. Boutwell gave the most damaging testimony against appellant save for the confession itself. The State acknowledged in jury argument that Boutwell was an admitted liar, but repeatedly called the jury's attention to the fact that her testimony was corroborated by appellant's confession. Boutwell was a co-defendant and an accomplice witness as a matter of law. *Ex parte Zepeda,* 819 S.W.2d 874, 875–76 (Tex.Crim.App.1991).[9] An accomplice witness is a discredited witness. *Paulus v. State,* 633 S.W.2d 827, 843 (Tex.Crim.App. 1981). A conviction cannot be had upon the testimony of an accomplice witness alone unless such testimony has been corroborated as required by statute. Tex.Code Crim.Proc. Ann. art. 38.14 (West 1979). A confession cannot be used to corroborate an accomplice witness unless it is voluntarily made. 25 Tex.Jur.3d, *Criminal Law* § 3446, at 289 (1983). A forced confession is insufficient to corroborate an accomplice witness. *Id.; Abston v. State,* 141 S.W.2d 337 (Tex.Crim.App. 1940). The State's emphasis on the confession is evident and its probable consequences are obvious. As Justice White noted, confessions have a profound effect on jurors under almost any circumstances. Declaring the error here harmless may well encourage the State to obtain other confessions in the same manner. We cannot declare this violation of federal due process harmless beyond a reasonable doubt because we cannot find that it did not contribute to the conviction or punishment.

■■■ The admissibility of a Texas confession is also contingent on the accused being accorded "the due course of the law of the land." Tex. Const. art. I, § 19; *see Collins,* 352 S.W.2d at 843. A coerced confession is not admissible in light of the foregoing state constitutional provision. *See Faulkner,* 193 S.W.2d at 217. For the same reasons upon which we found the admission of appellant's confession violated the due process clause of the Fourteenth Amendment, we find on independent state grounds that the confession's admission also violated article I, section 19 of the state constitution and article 38.21 of the Texas Code of Criminal Procedure.

■■■ In *Connor v. State,* 773 S.W.2d 13 (Tex.Crim.App.1989), the Court of Criminal Appeals noted that a state appellate court may construe its comparable state constitutional provision more broadly than the United States Supreme Court does the federal constitutional provision. *Connor* held that the error in admitting a coerced confession obtained through physically threatening coercive tactics by the police is not subject to a harm analysis. *Id.* at 15–16. Finding no authority to show that the admission of a coerced confession obtained by physical violence and threats in violation of article I, section 19 of our state constitution or our statutory provisions is subject to a harm analysis, we decline to apply such analysis.[10] We sustain appellant's first three points of error that the trial court erred in overruling the motion to suppress.

In view of our disposition of these three points, we need not reach appellant's contention that his confession was tainted by the fact that at time he had been restrained by virtue of an illegal warrantless arrest. The same is true of appellant's other points of error dealing with the admission of the confession.

## THE ADMISSION OF EXTRANEOUS OFFENSES

There is another independent basis for reversal of appellant's conviction. In points

9. The trial court failed to instruct the jury that Boutwell was an accomplice witness either as a matter of fact or as a matter of law. There was no objection to the court's charge on this basis. The failure of the trial court to so charge sua sponte is another point of error.

10. If we did apply such a harm analysis, we see no reason why we would reach a different conclusion than we did on federal grounds.

of error eleven, twelve, and thirteen, appellant contends that the trial court erred in allowing Kim Boman to testify, over objection, regarding extraneous offenses and misconduct by appellant that were inadmissible under Texas Rules of Criminal Evidence 401, 403, and 404(b).

In rebuttal, the State called Kim Boman, appellant's former girlfriend, who lived with him from July 1987 to July 1989. On voir dire examination, in the absence of the jury, Boman testified that several months after their relationship began, appellant became possessive and abusive, both physically and verbally; that he accused her of flirting and sleeping with other men, and that on occasions he pulled her hair, threw her against the wall, hit and kicked her, poked her in the chest, and boxed her eyes. Once he hit her in the face, but thereafter during other beatings told her that he would not strike her face because the bruises would be visible. After one beating, Boman recalled that she took an overdose of pills. Appellant told her that he could not call EMS because her bruises would be observed. Appellant then placed her in a tub and dunked her head in the water. After Boman's proffered testimony, the trial court overruled appellant's Rule 401 and Rule 404(b) objections that the evidence was not relevant and was offered only to show bad "character, character, character." The trial court expressly admitted the evidence only to show "motive and intent" and added that the probative value of the evidence outweighed its prejudicial effect. When appellant then made his Rule 403 objection in accordance with the procedure described in *Montgomery v. State,* 810 S.W.2d 372, 395 (Tex.Crim.App.1990), the trial court stated that it had already ruled, despite appellant's protest that the trial court had not factored in the State's need for the evidence as required.

In the presence of the jury, Kim Boman was permitted to describe a two-year period of abuse and violence which encompassed many acts. Boman, who was sixteen years old when she began to live with appellant,[11] eventually broke off the relationship. Boman

was not shown to have a connection with or knowledge of the instant offense.

It is a fundamental tenet of our system of jurisprudence that an accused must only be tried for the offense of which he is charged and not for being a criminal generally. *Owens v. State,* 827 S.W.2d 911, 914 (Tex.Crim.App.1992); *Templin v. State,* 711 S.W.2d 30, 32 (Tex.Crim.App.1986).

> Because extraneous offense evidence carries with it the inherent risk that a defendant may be convicted because of his propensity for committing crimes generally— i.e., his bad character—rather than for the commission of the charged offense, courts have historically been reluctant to allow evidence of an individual's prior bad acts or extraneous offenses. Under Tex. R.Crim.Evid. 404(b) extraneous offense evidence may be admissible only if it tends to prove a material fact in the State's case, apart from its tendency to demonstrate an accused's general propensity for committing criminal acts.

*Owens,* 827 S.W.2d at 914.

Rule 404(b) states in pertinent part:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

If the evidence is relevant for a purpose other than character conformity, the evidence should be admitted. *Montgomery,* 810 S.W.2d at 387–88; *Peterson v. State,* 836 S.W.2d 760, 762 (Tex.App.—El Paso 1992, pet. ref'd). The determination of whether the evidence is relevant to any issue in the case lies within the sound discretion of the trial court. *Massey v. State,* 826 S.W.2d 655, 658 (Tex.App.—Waco 1992, no pet.). In the instant case, Boman's testimony was admitted only on the issues of motive and intent. Motive is not an essential element of a criminal offense and need not be proved to establish the commission of the offense. *Bush v.*

---

11. Appellant argues that this evidence reflected the extraneous offense of "statutory rape." *See*

Tex.Penal Code Ann. § 22.011 (West 1994) and its predecessors.

*State,* 628 S.W.2d 441, 444 (Tex.Crim.App. 1982); *Rodriguez v. State,* 486 S.W.2d 355, 358 (Tex.Crim.App.1972). The admissibility of evidence of extraneous offenses as to motive is usually required to relate or pertain to other acts by the accused against the victim of the crime for which the accused is presently being prosecuted. *Foy v. State,* 593 S.W.2d 707, 708–09 (Tex.Crim.App.1980); *Lazcano v. State,* 836 S.W.2d 654, 660 (Tex. App.—El Paso 1990, pet. ref'd). In addition, it must fairly tend to raise an inference in favor of the existence of the motive on the part of the accused to commit the offense for which he is being tried. *Rodriguez,* 486 S.W.2d at 358; *Massey,* 826 S.W.2d at 658.

■ The evidence challenged in the instant case does not pertain to the same victim. The evidence described assaults upon a young woman when she was sixteen to eighteen years old, whereas appellant was on trial for injuries to a two-year-old male child. Boman acknowledged that most of the assaults occurred after appellant had accused her of flirting and sleeping with other men. The evidence of appellant's assaults on Boman did not explain why appellant would assault the child victim in this cause other than it showed his propensity to engage in assaultive conduct—the type of character conformity evidence that Rule 404(b) prohibits. *See Gilbert v. State,* 808 S.W.2d 467, 473 (Tex.Crim.App.1991). We conclude that the trial court abused its discretion in admitting Boman's testimony on the basis of motive.

■ Extraneous-offense evidence is admissible as an exception to the general rule to prove scienter if the requisite guilty intent cannot be inferred from the act itself. *Morgan v. State,* 692 S.W.2d 877, 880–81 (Tex. Crim.App.1985); *Lazcano,* 836 S.W.2d at 659. Intent can be inferred from acts, words, and conduct of the accused. *Dues v. State,* 634 S.W.2d 304, 306 (Tex.Crim.App.1982); *Martinez v. State,* 844 S.W.2d 279, 283 (Tex. App.—San Antonio 1992, pet. ref'd). Since mental culpability is of such a nature that it generally must be inferred from the circumstances under which the prohibited act occurred, the trier of fact may infer intent from any facts in evidence which tend to prove existence of such intent. *Hernandez v.*

*State,* 819 S.W.2d 806, 810 (Tex.Crim.App. 1991), *cert. denied,* 504 U.S. 974, 112 S.Ct. 2944, 119 L.Ed.2d 568 (1992).

■ Here, there was medical testimony about the victim's injuries and the cause of death. Photographs introduced into evidence reflected those injuries. There was testimony from Boutwell, neighbors, and others about appellant's repeated verbal and physical conduct towards the victim. The circumstances surrounding the commission of the offense abundantly supported a strong inference of appellant's intent without the need for the extraneous offense evidence. The trial court abused its discretion in admitting the extraneous offenses on the issue of intent.

■ Even if it could be argued that for some reason appellant's stormy two-year relationship with Boman and all its details of extraneous offenses were relevant apart from character conformity as required by Rule 404(b), appellant also objected to the testimony on the basis of Rule 403. Given the circumstances, the trial court also erred in overruling the Rule 403 objection. Without reiterating the evidence, the danger of the unfair prejudice substantially outweighed any probative value of the proffered evidence. The trial court abused its discretion in failing to exclude Boman's testimony of extraneous offenses. *Montgomery,* 810 S.W.2d at 392; *Gilbert,* 808 S.W.2d at 472.

■ This determination alone does not dictate an automatic reversal. We must next conduct a harmless error analysis. Tex. R.App.P. 81(b)(2); *Montgomery,* 810 S.W.2d at 397. Having found error, we will reverse the judgment and remand the cause to the trial court unless we are able to conclude beyond a reasonable doubt that the error made no contribution to the conviction or punishment. Tex.R.App.P. 81(b)(2). An appellate court does not determine harmlessness by examining whether the evidence overwhelmingly supports a verdict of guilty; rather, the court should calculate the error's probable impact on the jury in light of the existence of the other evidence. *Anderson v. State,* 817 S.W.2d 69, 72 (Tex.Crim.App. 1991); *Harris,* 790 S.W.2d at 587–88. To

reach such a determination, the appellate court should first isolate the error and all its effects and then ask whether a rational trier of fact might have reached a different result but for the error and its effects. *Harris,* 790 S.W.2d at 588. In performing the isolating analysis, the reviewing court examines the source and nature of the error, the extent to which the State emphasized the error, and the error's possible collateral implications. The reviewing court further considers how much weight a juror might place on the error. *Id.* at 587. A conviction is tainted if the error is of such a magnitude that it disrupted the jurors' orderly evaluation of the evidence, no matter how overwhelming the other evidence. *Id.* at 588.

■ The error was the admission of Boman's testimony of appellant's numerous extraneous offenses. The testimony was not admissible for the purposes for which it was expressly admitted. In jury argument, the State emphasized the error. In arguing that appellant, not Boutwell, caused the child's injuries, the prosecutor argued that the jury had heard "from Kim Boman what this man is capable of." The State was thus erroneously using the testimony to show appellant's character and to suggest that he acted in conformity therewith. In applying the harmless error test of *Harris,* we cannot conclude beyond a reasonable doubt that the error did not contribute to appellant's conviction. Points of error eleven, twelve, and thirteen are sustained.

## THE DOUBLE JEOPARDY ISSUE

In points of error twenty-nine, thirty, and thirty-one, appellant urges that the trial court erred in retrying appellant over his "double jeopardy" objection, and in denying his pretrial motion to bar retrial under the double jeopardy clause of the Fifth and Fourteenth Amendments to the United States Constitution and under article I, section 14 of the Texas Constitution.

On October 30, 1990, the jury retired for deliberations at the guilt/innocence stage of appellant's first trial. A note from the jury revealed that the box of exhibits contained certain exhibits which had not been introduced at trial. One of these exhibits was a transcription of appellant's taped confession. When the error was discovered, appellant's counsel requested a mistrial. His motion was granted by the court. Thereafter, on January 23, 1991, appellant filed a plea of double jeopardy and an application for a writ of habeas corpus based on double jeopardy grounds. After a hearing, the trial court denied the plea and refused relief in the habeas corpus proceedings. Appellant appealed the habeas corpus ruling. This Court in *Ex parte Zuliani,* No. 03–91–00055–CR, (Tex.App.—Austin, June 27, 1991, pet. ref'd) (not designated for publication), affirmed the trial court's order denying relief, noting that when a defendant successfully moves for a mistrial, he may not thereafter invoke the bar of double jeopardy against a second trial unless the conduct giving rise to the motion for mistrial was intended to provoke the defendant into making the motion. *See Oregon v. Kennedy,* 456 U.S. 667, 679, 102 S.Ct. 2083, 2091, 72 L.Ed.2d 416 (1982); *Collins v. State,* 640 S.W.2d 288, 290 (Tex.Crim.App.1982). This Court found no evidence that the conduct giving rise to appellant's motion for mistrial was intended to provoke the motion. A petition for discretionary review was subsequently refused by the Court of Criminal Appeals. The application for writ of certiorari was denied by the United States Supreme Court. *Zuliani v. State,* 502 U.S. 1104, 112 S.Ct. 1196, 117 L.Ed.2d 437 (1992).

■ Appellant now directs our attention to certain record page numbers of the instant trial where he claims he asserted his "double jeopardy" objections. There, we find that he only orally asserted a Fifth Amendment claim. A review of the post-first trial motion shows that his plea was based on unenumerated provisions of the federal and state constitutions. Be that as it may, we find no distinction between his present claims and the ones previously litigated. Under "the law of the case" doctrine, determinations as to questions of law having been made on a prior appeal in the same case will be held to govern the case throughout all of its subsequent stages, including a retrial and subsequent appeal. *Satterwhite v. State,* 858 S.W.2d 412, 429–30 (Tex.Crim.App.), *cert. denied,* —— U.S. ——, 114 S.Ct. 455, 126

L.Ed.2d 387 (1993); *Harris v. State,* 790 S.W.2d 568, 579 (Tex.Crim.App.1989); *Ware v. State,* 736 S.W.2d 700, 701 (Tex.Crim.App. 1987). We find no compelling circumstances requiring redetermination of the point of law decided on a prior appeal. *Ex parte Granger,* 850 S.W.2d 513, 516 (Tex.Crim.App. 1993). Points of error twenty-nine, thirty, and thirty-one are overruled.

In view of our disposition of points of error one, two, three, eleven, twelve, and thirteen, the judgment of conviction must be reversed and the cause remanded to the trial court.