# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-00-00538-CR

**Gerald C. Zuliani, Appellant**

**v.**

**The State of Texas, Appellee**

### FROM THE DISTRICT COURT OF TRAVIS COUNTY, 299TH JUDICIAL DISTRICT
### NO. 0970158, HONORABLE FRED A. MOORE, JUDGE PRESIDING

A jury found appellant Gerald C. Zuliani guilty of involuntary manslaughter. The district court assessed punishment at ten years' imprisonment and a fine of $10,000. In six points of error, appellant contends the district court erred by overruling his motion to quash the indictment and that the evidence is legally and factually insufficient. Finding these contentions to be without merit, we affirm the judgment of conviction.

## BACKGROUND

Appellant and Robbi Boutwell were married in December 1989. Boutwell had two children by a previous marriage: Christopher Wohlers, age two, and Jennifer Wohlers, age four. Boutwell and the children had lived with appellant for several weeks before the marriage.

At 10:44 p.m. on January 2, 1990, emergency medical services workers responded to a 911 call from Boutwell who requested an ambulance because her son had "passed out while

he was taking a bath" and had "slipped under the water." Boutwell reported, "We have been trying to administer CPR, but he is not responding. He has a heartbeat and . . . he is throwing up stuff, but I can't get him to like breathe. He is losing color and coming back and losing color and coming back." Within eight minutes of the call, as the EMS dispatcher gave CPR instructions to Boutwell over the telephone, EMS personnel and Austin police officers arrived at the Zuliani home. Boutwell informed them that she had left the child alone for a minute or two and had returned to find him submerged in water.

Paramedics treating Christopher at the scene observed that he was not breathing and that his hair and body were dry. One paramedic observed multiple bruises on Christopher's body, including swelling and bruising on the scrotum and a ligature mark on the penis. Appellant attempted to cover Christopher's genitals with a sweatshirt, but the paramedic instructed the parents not to "cover up the baby anymore" so they could continue to work on him.

Christopher was taken to the hospital emergency room at approximately 11:30 p.m. The treating physician, Dr. John Jaffe, observed that he was not conscious or breathing on his own. Dr. Jaffe quickly determined that the child was not a drowning victim and that the parents' report of an immersion injury was not consistent with the actual injuries. Based on multiple retinal hemorrhages and the lack of neurological function, the doctor determined that Christopher had a closed head injury and was severely brain damaged. He also observed multiple bruises on various parts of the child's body, including his penis. A later CT scan confirmed that Christopher had a severely injured brain, with two different areas of bleeding in the subdural space in the brain, and a fractured skull. Dr. Jaffe concluded that Christopher had been beaten.

At the police station, after initially telling the police that her son had become submerged in water when she left him alone in the bathtub, Boutwell described finding appellant in the bathroom with Christopher, who was lying unconscious on the floor. She also related conduct by appellant that caused the injuries. Christopher was pronounced dead on the afternoon of January 3, 1990. On January 4, an autopsy determined that death was caused by bilateral subdural hemorrhaging with marked edema of the brain due to blunt trauma to the head.

Appellant was first indicted and tried for intentionally and knowingly causing serious bodily injury to a child. *See* Act of May 29, 1989, 71st Leg., R.S., ch. 357, § 1, 1989 Tex. Gen. Laws 1441, 1441 (Tex. Penal Code Ann. § 22.04(a)(1), since amended). He was convicted of the lesser included offense of recklessly causing the injury, but the conviction was reversed by this Court in 1995 and the cause was remanded for a new trial. *See Zuliani v. State*, 903 S.W.2d 812 (Tex. App.—Austin 1995, pet. ref'd).[1]

On January 21, 1997, appellant was re-indicted for murder on the theory that he caused Christopher's death by preventing Boutwell from obtaining medical care for the child. *See* Act of May 28, 1973, 63rd Leg., R.S., ch. 426, art. II, sec. 1, § 19.02, 1973 Tex. Gen. Laws 1122, 1123 (Tex. Penal Code Ann. § 19.02(a)(1), since amended). A second count, alleging that appellant recklessly caused serious bodily injury to the child, was abandoned by the State prior to trial. The jury found appellant guilty of the lesser included offense of involuntary manslaughter.

---

[1] This conviction followed appellant's second trial on the original indictment. His first trial ended in a mistrial after it was discovered that certain items not in evidence, including appellant's confession, had been inadvertently sent to the jury room with the exhibits properly admitted into evidence.

*See* Act of May 29, 1987, 70th Leg., R.S., ch. 307, § 1, 1987 Tex. Gen. Laws 1698, 1698 (Tex. Penal Code Ann. § 19.05(a)(1), since recodified as § 19.04(a)).

**DISCUSSION**

**I. Prosecutorial Vindictiveness**

In his first point of error, appellant contends his Fourteenth Amendment due process rights were violated when the State indicted him for murder, a first degree felony, after his conviction for recklessly injuring a child, a third degree felony, was reversed on appeal. *See* U.S. Const. amend. XIV. Appellant argues that a presumption of vindictiveness applies when a second prosecution "presents a risk of greater punishment." Once the presumption was raised, appellant contends, it was the State's burden to rebut the presumption by presenting reasons or circumstances demonstrating that the decision to reindict for a greater offense was motivated by a legitimate purpose.

The State responds that because the original indictment accused appellant of intentional injury to a child, a first degree felony, the second indictment did not accuse appellant of a greater offense and therefore no presumption was raised. The State further contends that it had a constitutionally legitimate reason for reindicting appellant and that, in any event, appellant suffered no harm because he received the same penalty at the second trial as he received at the first.

At the hearing on appellant's motion to quash, the prosecutor denied that the new indictment was obtained to retaliate against appellant for his successful appeal of the first conviction. He stated that the decision to seek the murder indictment was based on his evaluation

4

of the facts when he took over the case from another prosecutor. Because the offense charged in the second indictment carried the same penalty as that charged in the original indictment, he urged that there was no potential for vindictiveness. The trial court found no vindictiveness and denied the motion.

In *North Carolina v. Pearce*, the Supreme Court addressed whether a trial judge could increase a defendant's sentence after conviction at a retrial following a successful appeal. *North Carolina v. Pearce*, 395 U.S. 711 (1969). Two separate cases were before the Court in *Pearce*. In both cases, the defendants successfully appealed their original convictions and on retrial received greater sentences than they had originally received. The Court held that neither the Double Jeopardy Clause nor the Equal Protection Clause barred imposition of the greater sentences at the retrials. But it held that the Due Process Clause barred the increased sentences if they were actually motivated by vindictive retaliation: "Due process of law, then, requires that vindictiveness against a defendant for having successfully attacked his first conviction must play no part in the sentence he receives after a new trial." *Id*. at 725. Because fear of such vindictiveness might chill a defendant's decision to appeal, the Court went on to say that "due process also requires that a defendant be freed of apprehension of such a retaliatory motivation on the part of the sentencing judge." *Id*.

To ensure the absence of vindictiveness and to assure defendants that they will not be penalized for asserting their rights on appeal, the Supreme Court fashioned a rule requiring that whenever a judge imposes a more severe sentence on a defendant after a new trial, the judge must affirmatively state objective reasons for the increase in sentence. *Id*. at 726. In *Pearce*, the State

offered no evidence to justify the increased sentence and advanced no reason for the greater penalty. Finding no explanation for the increased sentences in either of the two cases, the court affirmed the judgments granting relief. *Id*.

The Supreme Court extended the rationale of *Pearce* to a claim of prosecutorial vindictiveness in *Blackledge v. Perry*, 417 U.S. 21 (1974). In that case, the defendant was convicted of a misdemeanor by a lower state court. After the defendant claimed his right to trial *de novo* in a higher court, the prosecutor obtained a superseding indictment charging the defendant with a felony rather than a misdemeanor. As with a judge who resentences a defendant, the Court concluded that a prosecutor's discretion to reindict a defendant is limited by the Due Process Clause. *Id*. at 27-29. The Court held that a defendant's right to due process is offended when the government responds to his invocation of the right to appeal by bringing a more serious charge before retrial: "A person convicted of an offense is entitled to pursue his statutory right to a trial *de novo*, without apprehension that the State will retaliate by substituting a more serious charge for the original one, thus subjecting him to a significantly increased potential period of incarceration." *Id*. at 28. The Court noted, however, that the Due Process Clause is not offended by all possibilities of increased punishment, but only by those that present a realistic likelihood of vindictiveness. *Id*. at 27.

Appellant does not claim that there is evidence of actual vindictiveness in this case. Instead, he asserts that the circumstances create a presumption of vindictiveness that could be overcome only by affirmative evidence of a nonvindictive reason for seeking the new indictment.

6

A presumption of vindictiveness arises when the circumstances of the case create a realistic likelihood of prosecutorial vindictiveness. *United States v. Johnson*, 171 F.3d 139, 141 (2d Cir. 1999); *see also United States v. Goodwin*, 457 U.S. 368, 374 (1982) (declining to apply presumption of vindictiveness when prosecutor obtained indictment for more serious offense after defendant invoked right to jury trial). Although a prosecutor may not use the charging process to penalize a defendant for the exercise of his constitutional rights, courts have resisted drawing bright lines and classifying any particular prosecutorial decision as *per se* vindictive. *See United States v. Krezdorn*, 718 F.2d 1360, 1364-65 (5th Cir. 1983). The relevant question is whether there is a realistic likelihood that the prosecutor acted out of a vindictive motive rather than a legitimate one. *See Goodwin*, 457 U.S. at 373; *Blackledge*, 417 U.S. at 27.

Reindictment does not automatically give rise to an inference of vindictiveness. *See, e.g., Johnson*, 171 F.3d at 140-41. The practice condemned in *Blackledge* was the prosecutor's "upping the ante" in response to the defendant's invocation of his right to appeal by bringing a more serious charge against him. *Blackledge*, 417 U.S. at 28. In the context of a retrial, a presumption of vindictiveness may arise when, in the absence of new evidence, a defendant is indicted for a new, more serious offense after successfully appealing his conviction. *See Ronk v. State*, 578 S.W.2d 120, 121 (Tex. Crim. App. 1979). The presumption does not arise if the new charges are no more serious than those in the original indictment. *See, e.g., Neal v. Cain*, 141 F.3d 207, 214 (5th Cir. 1998).

7

Unlike the defendant in *Blackledge*, appellant was not indicted for a more serious offense following his successful appeal of his first conviction. Instead, the prosecutor's assessment of the severity of the crime was the same both before and after appellant's first appeal. Appellant was originally indicted for intentionally and knowingly causing serious bodily injury to a child, a first degree felony.[2] The second indictment also accused appellant of a first degree felony, murder. Both indictments subjected appellant to the same potential period of incarceration. Although the second indictment contained a second count, the State abandoned it and proceeded to trial on the single murder charge.

We hold that appellant's conviction for a lesser offense at the first trial did not create a due process ceiling for any subsequent indictment based on the same conduct. Because the two indictments carried identical penalties and the number of charges against appellant was not increased, no presumption of prosecutorial vindictiveness arises from the second indictment.

Even apart from the number and severity of charges, we cannot say that there is a realistic likelihood of vindictiveness in light of the punishments assessed at the two trials. At the first trial, the jury convicted appellant of a lesser-included third-degree felony offense and assessed punishment at ten years' imprisonment and a $10,000 fine. On retrial, the jury also

---

[2]    That intentional injury to a child was a first degree felony at the time the instant offense was committed distinguishes appellant's case from *Ronk v. State*, 578 S.W.2d 120 (Tex. Crim. App. 1979). In *Ronk*, the defendants were indicted for murder after they successfully appealed their convictions for injury to a child. At the time of the offense in *Ronk*, intentional injury to a child was a second degree felony. *See* Penal Code, 63rd Leg., R.S., ch. 399, sec. 1, § 22.04, 1973 Tex. Gen. Laws 883, 920 (Tex. Penal Code Ann. § 22.04, since amended). The court of criminal appeals held that it was impermissible for the State to respond to the defendants' successful appeals of the original convictions by bringing the more serious charge against them. *Ronk*, 578 S.W.2d at 121.

found appellant guilty of a lesser-included third-degree felony offense and the judge sentenced him to ten years' imprisonment and a $10,000 fine. Thus, both trials resulted in convictions for third degree felonies and the sentences imposed were the same.

Appellant would have us presume vindictiveness from the prosecutor's delay in seeking the second indictment and the failure to include the murder charge in the original indictment. Appellant has cited us to no case, and we have found none, in which a court has presumed or upheld a claim of prosecutorial vindictiveness based on delay in reindictment. Likewise, we decline to accept appellant's invitation to condemn the State for proceeding on a charge it could have included in the original indictment. The original decision to prosecute appellant for intentional injury to a child rather than murder was a question of trial strategy; it had no punishment implications since both offenses are first degree felonies. The most plausible explanation for the State's decision to prosecute appellant for murder at the second trial is not retribution for appellant's successful appeal of his first conviction, but a desire to obtain a conviction for an offense commensurate with the State's view of the seriousness of appellant's conduct. *See Neal*, 141 F.3d at 214.

In the absence of a presumption of prosecutorial vindictiveness, then, the burden was on appellant to come forward with proof of retaliatory motive or other circumstances indicating vindictiveness. *Wasman v. United States*, 468 U.S. 559 (1984). This he failed to do.

In sum, we find no evidence of a vindictive motive on the part of the State and no circumstances that indicate a reasonable likelihood of vindictiveness in this case. Because no direct evidence of actual vindictiveness was presented by appellant, the number and severity of

9

charges were not increased, and the sentence was not greater than that imposed in the first trial, we overrule appellant's first point of error.

## II. Sufficiency of the Evidence

The indictment alleged that appellant intentionally and knowingly caused Christopher Wohlers' death by preventing Boutwell from obtaining medical care for him. At appellant's request, the court's charge gave the jury the options of finding that appellant acted recklessly or with criminal negligence. The jury found that appellant recklessly prevented Boutwell from obtaining medical care, and thus convicted him of involuntary manslaughter.

In his remaining points of error, appellant contests the sufficiency of the evidence to sustain the jury's verdict. He contends the evidence is legally and factually insufficient to prove (1) that he prevented Boutwell from obtaining medical care for Christopher, and (2) that by preventing Boutwell from obtaining medical care, he caused the child's death. In his final point of error, appellant contends the State failed to corroborate Boutwell's accomplice witness testimony.

The State argues that because appellant asked the court to authorize his conviction for the lesser included offense, he is estopped from challenging the sufficiency of the evidence to sustain his conviction for that offense. A defendant who invokes the benefit of a lesser included offense instruction at trial is estopped from complaining on appeal that the evidence is legally insufficient with respect to a matter raised by the submission of the lesser offense. *See State v. Lee*, 818 S.W.2d 778, 781 (Tex. Crim. App. 1981) (murder defendant who requested instruction on voluntary manslaughter estopped from challenging sufficiency of evidence to prove sudden passion arising from adequate cause), *overruled on other grounds, Moore v. State*, 969 S.W.2d 4,

10

10 (Tex. Crim. App. 1998). In *Otting v. State*, 8 S.W.3d 681, 686-87 (Tex. App.—Austin 1999, pet. ref'd untimely filed), this Court wrote that a defendant tried on a capital murder indictment but convicted for injury to a child was estopped from contesting the legal and factual sufficiency of the evidence to sustain the conviction. Commentators have argued, however, that the estoppel rule announced in *Lee* should be limited to those matters raised by submission of the lesser included offense. 42 George E. Dix & Robert O. Dawson, *Criminal Practice and Procedure* § 31.75, at 177 (Texas Practice 1995). The issues raised by appellant also would have prevented his conviction for the murder offense alleged in the indictment. *See id.* Expressing no opinion on the estoppel issue, we will address appellant's contentions in the interest of justice.

### A. Failure to Obtain Medical Care

In his second point of error, appellant asserts that the evidence is legally insufficient to prove beyond a reasonable doubt that he prevented Boutwell from obtaining medical care for Christopher. He argues that because the evidence is insufficient to show that Boutwell was under duress or imminent threat of death or serious bodily harm, he had no control over her actions and did not prevent her from calling for medical assistance.

In determining the legal sufficiency of the evidence to support a criminal conviction, the question is whether, after viewing all the evidence in the light most favorable to the verdict, any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 324 (1979); *Griffin v. State*, 614 S.W.2d 155, 158-59 (Tex. Crim. App. 1981).

11

The State's main witness, Robbi Boutwell, testified at length about her brief relationship with appellant. Boutwell testified that after encountering appellant at a high school reunion, she rekindled a friendship with him in August 1989 and moved in with him several weeks before their marriage in December. Soon after moving in, Boutwell noticed a change in the way appellant treated her children. He took over the disciplining and toilet training of Christopher because, he complained, Boutwell was ineffective and too lenient.

Extensive testimony by various witnesses established that appellant was abusive towards Christopher. On one occasion, appellant admitted to Boutwell that he caused bruises on the child. On another occasion, in November, Boutwell left Christopher with appellant when she went on a brief trip to the grocery store. When she returned, appellant was holding the unconscious child in his arms. Boutwell observed that Christopher's breathing was shallow and his hands had turned inward. Appellant explained that Christopher had fallen off the toilet. On December 22, at the urging of Boutwell's parents, Christopher was admitted to the hospital because he was lethargic and shaking.

On December 31, 1989, appellant, Boutwell and the two children went on an overnight camping trip. The next day, appellant took Christopher deer hunting by himself. When they returned to the campsite, appellant was carrying Christopher in his arms. Christopher appeared to be unconscious. Appellant told inconsistent stories about what had transpired. Although Christopher regained consciousness, Boutwell noticed that one of his eyes did not track with the other eye.

12

On the morning of January 2, 1990, after dropping appellant off at work, Boutwell performed chores that had been assigned to her by appellant. Later in the day, Boutwell and appellant quarreled about the time she took to perform the allotted tasks. That evening, after disciplining Christopher for not eating correctly, appellant instructed him to watch television so that he could exercise his "lazy" eye. As Christopher's attention strayed from the television, appellant told Jennifer to hit her brother on the hand with a spoon. As he became more angry with Christopher, he told Jennifer to push him into the wall. When she did not push Christopher hard enough to satisfy him, appellant began to push Christopher into the wall until he fell down. At approximately 9:30 p.m., appellant took Christopher into the bathroom, telling Boutwell, "Kids learn from pain." As Boutwell huddled with her daughter on the couch, she heard sounds of water running and "thuds" coming from within the bathroom.

Several minutes later, appellant opened the door and called for Boutwell. When she arrived at the bathroom, Boutwell saw that both appellant and Christopher were naked. Christopher was lying unconscious on the floor. As both appellant and Boutwell tried to revive him, Boutwell told appellant that they should call for an ambulance. He refused, telling her that he was "not going down for murder." Boutwell then suggested that they call appellant's mother for help. Appellant agreed to this, but only appellant's father was home when Boutwell called. Appellant had a brief telephone conversation with his father. Shortly thereafter, appellant's parents arrived at the scene. Boutwell's testimony reflects that, in the meantime, she pleaded with appellant three more times before he allowed her to call for an ambulance.

13

Appellant seeks to discredit Boutwell's testimony by arguing that Boutwell merely "requested permission" to call for an ambulance and that the evidence is insufficient to show that he actually prevented her from taking action. Dr. Toby Myers, an expert witness in the field of domestic violence, testified that appellant's relationship with Boutwell was abusive and that he had established control over her. Based on her interview of Boutwell and review of Boutwell's prior testimony, Dr. Myers testified that appellant exerted control over Boutwell through intimidation, isolation, and verbal abuse. Dr. Myers opined that, based on appellant's control over Boutwell, she was prevented from obtaining medical care for her child.

Evidence of appellant's controlling behavior in the weeks preceding January 2 demonstrates that appellant had power and control over Boutwell and that she was fearful of him. He warned her that he would have her killed by a hit man if she tried to leave him. He also threatened her with various consequences if she discussed his conduct with her family or friends. Several witnesses testified to incidents exemplifying appellant's control over Boutwell as well as his abuse of Boutwell and Christopher. In addition to testimony of friends and family, two neighbors in the apartment complex where they lived observed abusive behavior and overheard family disturbances. Two police officers testified to their observations when they responded to a family disturbance report.

Viewing the evidence in the light most favorable to the verdict, we conclude that the jury could have found beyond a reasonable doubt that appellant exercised sufficient control over Boutwell to have prevented Boutwell from obtaining medical care for Christopher on the night of January 2, 1990. We overrule appellant's second point of error.

14

When conducting a factual sufficiency review, the evidence is not viewed in the light most favorable to the verdict. Instead, all the evidence is considered equally, including the existence of alternative hypotheses. *Orona v. State*, 836 S.W.2d 319, 321 (Tex. App.—Austin 1992, no pet.). A factual sufficiency review asks whether a neutral review of all the evidence, both for and against the finding of guilt, demonstrates that the proof of guilt is so obviously weak or so greatly outweighed by contrary proof as to undermine confidence in the jury's determination. *Johnson v. State*, 23 S.W.3d 1, 11 (Tex. Crim. App. 2000). A verdict may be set aside for factual insufficiency only if a finding of guilt beyond a reasonable doubt is clearly wrong and unjust. *Clewis v. State*, 922 S.W.2d 126, 129 (Tex. Crim. App. 1996); *Stone v. State*, 823 S.W.2d 375, 381 (Tex. App.—Austin 1992, pet. ref'd untimely filed).

Because Boutwell did not seek medical assistance until appellant dragged Christopher into the bathroom, appellant contends that Boutwell—not appellant—was reluctant to seek medical care. In the 911 call to EMS, Boutwell asked that Christopher be taken to South Austin Hospital instead of Brackenridge Hospital. Appellant argues that, because of a previous visit to Brackenridge, Boutwell was afraid she would become the focus of an abuse inquiry. Appellant also urges that Boutwell failed to take Christopher to the doctor on previous occasions. On December 18, appellant stayed with Christopher while Boutwell went to work. He called her at work and told her that Christopher had fallen off the counter and asked Boutwell if he should take the child to the doctor. Boutwell left the decision up to appellant and she stayed at work. Likewise, Boutwell did not take Christopher to the hospital after the camping trip on January 1, when the child appeared to be knocked out and unconscious. On cross-examination, Boutwell

15

acknowledged that there were numerous instances in which she did not take Christopher to the doctor when he was injured. She admitted that she had not been prevented from taking him to the doctor on those occasions.

Boutwell was described as a discredited witness even by the State. Nevertheless, the jury was free to accept any part of Boutwell's testimony. Because the jury is the sole judge of the facts, we must give deference to its verdict. *Cain v. State*, 958 S.W.2d 404, 407 (Tex. Crim. App. 1997). The weight to give contradictory testimony is within the sole province of the jury, because it turns on an evaluation of credibility and demeanor, and we are not free to reweigh the evidence merely because we feel that a different result is more reasonable. *Clewis*, 922 S.W.2d at 135. A decision is not manifestly unjust simply because the fact finder resolved conflicting views of the evidence in the State's favor. *Cain*, 958 S.W.2d at 410.

Given the testimony by various witnesses regarding appellant's control over Boutwell's actions, the expert testimony of Dr. Myers, and Boutwell's extensive testimony, we cannot say that the jury's conclusion that appellant prevented Boutwell from seeking medical attention for Christopher on the night in question was manifestly unjust. Point of error three is overruled.

### B. Causation

In his fourth and fifth points of error, appellant contends the evidence is legally and factually insufficient to support the jury's conclusion that by preventing Boutwell from obtaining medical care for Christopher, he caused the child's death. The State agrees that it was required to

16

prove causation as one of the elements of the offense. Section 6.04(a) of the Texas Penal Code

sets the standard for causation as follows:

> A person is criminally responsible if the result would not have occurred but for his conduct, operating either alone or concurrently with another cause, unless the concurrent cause was clearly sufficient to produce the result and the conduct of the actor clearly insufficient.

Tex. Penal Code Ann. § 6.04 (a) (West 1994).[3]

In interpreting this statute, the Court of Criminal Appeals has concluded that the

"but for" requirement is satisfied if either the defendant's conduct was "sufficient by itself to have

caused the harm, regardless of the existence of a concurrent cause" or "the defendant's conduct

and the other cause *together* may be sufficient to have caused the harm." *Robbins v. State*, 717

S.W.2d 348, 351 (Tex. Crim. App. 1986). The court added, "If the additional cause, other than

the defendant's conduct, is clearly sufficient, by itself, to produce the result *and* the defendant's

conduct, by itself, is clearly insufficient, then the defendant cannot be convicted." *Id*.

In the district court's charge, the jury was instructed:

> A person is criminally responsible if the result would not have occurred but for his conduct, operating either alone or concurrently with another cause, unless the concurrent cause was clearly sufficient to produce the result and the conduct of the defendant clearly insufficient.

> You are further instructed that you cannot find the defendant, Gerald Christopher Zuliani, guilty unless you believe beyond a reasonable doubt that the death of Christopher Wohlers would not have occurred but for the conduct of the defendant; so that if you believe the physical injury, if any, received by Christopher

---

[3]  Section 6.04 was not changed by the 1994 penal code amendments.

Wohlers on January 2, 1990, was a concurrent cause sufficient to cause his death and the conduct, if any, of the defendant in preventing Robbi Boutwell from obtaining medical care for the said Christopher Wohlers was clearly insufficient, or if you have a reasonable doubt thereof, you will acquit the defendant . . . .

Thus, the jury was called upon to answer two questions: (1) whether the concurrent cause, Christopher's physical injury, was clearly sufficient to cause his death, and (2) whether the appellant's conduct in preventing Boutwell from calling for medical assistance was clearly insufficient to cause his death. Before convicting appellant of involuntary manslaughter, the jury must have believed beyond a reasonable doubt that had it not been for appellant preventing Boutwell from calling for medical care, Christopher would have survived. If the jury believed that Christopher's physical injury was sufficient to cause his death *and* that appellant's conduct in preventing Boutwell from calling for medical help was insufficient, the jury was instructed to acquit appellant. Appellant does not challenge the charge delivered to the jury.

Boutwell testified that when she went into the bathroom, Christopher was still breathing. The emergency services technicians testified generally that when a child stops breathing time is critical. Dr. Jaffe testified that Christopher was not conscious or breathing on his own when the child first arrived at the emergency room. He was "near brain dead" and "near the end." Dr. Jaffe testified that the delay in treatment was significant: "[I]f he is not breathing adequately, then unless his breathing is restored to normal, then the pure fact that he is not breathing adequately will lead to additional injury to the brain and worsening an already bad situation." Dr. Jaffe concluded that "more likely than not" Christopher would have survived had medical personnel been able to get to him before he stopped breathing. He also testified that

18

intervention within four to fifteen minutes from the "cessation of oxygen" would "had to have helped the situation."

Dr. Vincent DiMaio, the chief medical examiner for Bexar County, confirmed Dr. Jaffe's medical opinion that Christopher's prognosis would have been good if Christopher was still breathing when medical personnel arrived because he had no sign of brain stem hemorrhage or irreversible injury. Dr. DiMaio was of the opinion that if doctors had been able to drain some of the blood collecting in Christopher's brain before the pressure forced the brain stem down the spinal canal, he would have had "a totally uneventful recovery." Dr. DiMaio estimated that Christopher's injury occurred between one-half hour and three hours before his collapse and that the amount of blood in his skull indicated that it took Christopher longer than half an hour to die: "So if you know that the child was up and walking around and appeared relatively normal, he did not have a subdural. Now, you know that when the child finally collapsed, the child had a big subdural. And the question was, how soon before that could he have gotten a significant subdural? The answer is a half-hour or an hour or two hours or three hours."

From Dr. DiMaio's and Dr. Jaffe's testimony, a jury could have reasonably concluded that the time after Boutwell found Christopher breathing in a shallow manner on the bathroom floor was critical and that it was the delay in obtaining medical care that caused the child's death. Accordingly, we conclude there is legally sufficient evidence of causation and we overrule appellant's fourth point of error.

Appellant challenges the factual sufficiency of the causation evidence because: (1) Boutwell did not attempt to summon medical care until she found her son on the floor in the

19

bathroom and (2) the doctor who conducted the autopsy expressed doubts about Christopher's survival even with prompt medical intervention.

Dr. Roberto Bayardo, the chief medical examiner for Travis County, testified that the autopsy was performed by the chief medical examiner from Harris County who was covering for Dr. Bayardo while he was on vacation. Dr. Bayardo testified that Christopher's injury was of such a serious nature that he had reservations whether medical intervention would have saved the boy's life. But on cross-examination, he deferred to the expertise of the treating physician on the child's survival prognosis.

Applying the factual sufficiency standard of review, viewing the evidence neutrally and giving due deference to the jury's verdict, we conclude that the jury's determination on the issue of causation was not so contrary to the overwhelming weight of evidence as to be clearly wrong and unjust. Appellant's fifth point of error is overruled.

## C. Corroboration of Accomplice Witness Testimony

In his final point of error, appellant urges that the evidence is legally insufficient because the State failed to corroborate the testimony of Robbi Boutwell, which was required because she was an accomplice witness. *See* Tex. Code Crim. Proc. Ann. art. 38.14 (West 1979). The State does not dispute that Boutwell was an accomplice witness, but contends that her testimony was corroborated by other witnesses.

To test the sufficiency of the corroboration of an accomplice witness, we set aside the accomplice's testimony and determine whether the remaining evidence tends to connect the accused with commission of the crime. *Walker v. State*, 615 S.W.2d 728, 731-32 (Tex. Crim.

20

App. 1981). We view the corroborating evidence in the light most favorable to the verdict. *Gill v. State*, 873 S.W.2d 45, 48 (Tex. Crim. App. 1994); *Utsey v. State*, 921 S.W.2d 451, 453 (Tex. App.—Texarkana 1996, pet. ref'd). The accomplice witness's testimony need not be entirely corroborated, nor need the corroboration directly link the accused to the crime or be sufficient in itself to establish guilt. *Hernandez v. State*, 939 S.W.2d 173, 176 (Tex. Crim. App. 1997); *Gill*, 873 S.W.2d at 48. The corroboration is sufficient if the cumulative weight of all the independent facts and circumstances tends to connect the defendant to the offense. *Hernandez*, 939 S.W.2d at 176; *Reed v. State*, 744 S.W.2d 112, 126 (Tex. Crim. App. 1988).

The State cites the testimony of two witnesses as tending to connect appellant with the commission of the offense. The first witness, Melvin Simms, was a jail counselor who notified appellant of Christopher's death. Simms testified that he overheard a telephone conversation between appellant and his grandmother in which appellant told her, "I'm sorry. I didn't mean to hurt Chris. I was just disciplining him the way my dad disciplined me."

The second witness was Christopher's sister Jennifer, who was four at the time of these events. Recalling the night of January 2, 1990, she testified that appellant was in the bathroom with the door closed: "And I just remember, I don't know if my little brother was in there with him, but I'm pretty sure he was, because he wasn't anywhere else." While her testimony was contradictory and her memory dim, it was sufficient for a rational jury to have believed that appellant was in the bathroom with Christopher as Boutwell testified.

While the testimony of these witnesses is not sufficient to convict appellant of involuntary manslaughter, it is sufficient to connect him to the offense. Therefore, Boutwell's testimony was adequately corroborated. We overrule appellant's sixth point of error.

Having overruled appellant's six points of error, we affirm the trial court's judgment.

_____

Jan P. Patterson, Justice

Before Chief Justice Aboussie, Justices Yeakel and Patterson

Affirmed

Filed: June 29, 2001

Do Not Publish