ACCEPTED
03-14-00734-CR
5294120
THIRD COURT OF APPEALS
AUSTIN, TEXAS
5/14/2015 5:56:17 PM
JEFFREY D. KYLE
CLERK

No. 03-14-00734-CR

IN THE COURT OF APPEALS

FILED IN
3rd COURT OF APPEALS
AUSTIN, TEXAS
5/14/2015 5:56:17 PM
JEFFREY D. KYLE
Clerk

FOR THE THIRD JUDICIAL DISTRICT

# BRUCE WAYNE HARKEY

APPELLANT

VS.

THE STATE OF TEXAS,
APPELLEE

## APPELLANT'S BRIEF

On appeal from Cause Number 5731
in the 33RD District Court
San Saba County, Texas
Honorable J. Allen Garrett, Judge Presiding

KEITH S. HAMPTON
Attorney at Law
State Bar No. 08873230
1103 Nueces Street
Austin, Texas  78701
(512) 476-8484
keithshampton@gmail.com

RICHARD D. DAVIS
Attorney at Law
State Bar No. 05537100
P. O. Box 398
Burnet, Texas 78611
(512) 756-5117
rdd@austin.twcbc.com

Attorneys for Appellant

*ORAL ARGUMENT RESPECTFULLY REQUESTED*

# IDENTITIES OF PARTIES AND COUNSEL

Pursuant to the provisions of Rule 38.1(a), Texas Rules of Appellate Procedure, a complete list of the names of all parties to this action and counsel are as follows:

**Parties:**  Mr. Bruce Wayne Harkey, Appellant; the State of Texas, Appellee

**Attorneys for the Appellant:**

Richard D. Davis
P.O. Box 398
Burnet, Texas 78611

Tommy Adams
1901 Vincent
Brownwood, Texas 76801

Barton Joseph Vana
101 Highway 281 North, Suite 205C
Marble Falls, Texas 78654

Keith S. Hampton
1103 Nueces Street
Austin, Texas 78701

**Attorneys for the State:**

Wiley "Sonny" McAfee, Jr.
Anthony J. Dodson
District Attorney's Office
33rd and 424th Judicial District
1701 E. Polk Street, Suite 24
Burnet, Texas 78611

# TABLE OF CONTENTS

IDENTITIES OF PARTIES AND COUNSEL.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

INDEX OF AUTHORITIES.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . v

STATEMENT OF THE CASE.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1-2

ISSUES PRESENTED. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

SUMMARY OF FACTS.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

SUMMARY OF THE ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3-4


**ISSUE NO. ONE: THE ACCOMPLICE WITNESSES' TESTIMONY WAS INSUFFICIENTLY CORROBORATED UNDER ARTICLE 38.14 OF THE CODE OF CRIMINAL PROCEDURE TO SUSTAIN A CONVICTION OF THE CAPITAL MURDER OF KAREN JOHNSON.**. . . . . . . . . . . . . . . . . . . . 5


**ISSUE NO. TWO: THE ACCOMPLICE WITNESSES' TESTIMONY WAS INSUFFICIENTLY CORROBORATED UNDER ARTICLE 38.14 OF THE CODE OF CRIMINAL PROCEDURE TO SUSTAIN A CONVICTION OF THE CAPITAL MURDER OF BONNIE HARKEY.**. . . . . . . . . . . . . . . . . . . . 5

State's evidence purporting to connect Appellant to the Murders.. . . . . . . . . 8

Argument and Authorities.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20-22


**ISSUE THREE: THE TRIAL COURT ERRED IN ALLOWING THE STATE, DURING ITS CASE-IN-CHIEF, TO INTRODUCE EVIDENCE OF EXTRANEOUS ACTS OF SEEKING MULTIPLE MURDERS, CONTRARY TO RULES 403 AND 404(B) OF THE TEXAS RULES OF EVIDENCE.**. . . 23

**ISSUE FOUR: THE TRIAL COURT ERRED IN ALLOWING THE STATE, DURING ITS CASE-IN-CHIEF, TO INTRODUCE EVIDENCE OF THE EXTRANEOUS ACT OF SOLICITING SOMEONE TO KILL BONNIE HARKEY BECAUSE THE STATE GAVE NO NOTICE OF ITS INTENT TO INTRODUCE SUCH EVIDENCE.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

PRAYER. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

CERTIFICATE OF COMPLIANCE.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

CERTIFICATE OF SERVICE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

# INDEX OF AUTHORITIES

*Boone v. State*, 90 Tex.Cr.R. 374, 235 S.W. 580 (Tex.Crim.App. 1922).. . . . . . . 20

*Boutwell v. State*, 719 S.W.2d 164 (Tex.Crim.App. 1985).. . . . . . . . . . . . . . . . 27

*Bruton v. United States*, 391 U.S. 123 (1968).. . . . . . . . . . . . . . . . . . . . . . . 6

*Burks v. State*, 876 S.W.2d 877 (Tex.Crim.App. 1994), *cert. denied*, 513 U.S. 1114 (1995).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Carrillo v. State*, 591 S.W.2d 876 (Tex.Crim.App. 1979). . . . . . . . . . . . . . . . . 5

*Cruz v. State*, 737 S.W.2d 74 (Tex.App. – San Antonio 1987). . . . . . . . . . . . . . 27

*Edwards v. State*, 427 S.W.2d 629 (Tex.Crim.App. 1968).. . . . . . . . . . . . . . . . 7

*Fields v. State*, 426 S.W.2d 863 (Tex.Crim.App. 1968). . . . . . . . . . . . . . . . . . 20

*Galvez v. State*, 962 S.W.2d 203 (Tex.App. – Austin 1998, *pet. ref'd*). . . . . . . . 28

*Gamez v. State*, 737 S.W.2d 315 (Tex.Crim.App. 1987). . . . . . . . . . . . . . . . . . 24

*Gandy v. State*, 835 S.W.2d 238 (Tex.App. – Houston [1ˢᵗ Dist.] 1992, *pet. ref'd*).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Hayden v. State*, 66 S.W.3d 269 (Tex.Crim.App. 2001). . . . . . . . . . . . . . . . . . 34

*Harris v. State*, 790 S.W.2d 568 (Tex.Crim.App. 1989). . . . . . . . . . . . . . . . . . 31

*Holladay v. State*, 709 S.W.2d 194 (Tex.Crim.App. 1986). . . . . . . . . . . . . . . . 20

*Johnson v. State,* 43 S.W.3d 1 (Tex.Crim.App. 2001). . . . . . . . . . . . . . . . . . . 30

*Kelly v. State*, 828 S.W.2d 162 (Tex.App. — Waco 1992). . . . . . . . . . . . . . . . . 27

*Krulewitch v. United States*, 336 U.S. 440 (1949). . . . . . . . . . . . . . . . . . . . . 23

*Kunkle v. State*, 771 S.W.2d 435 (Tex.Crim.App. 1986), *cert. denied*, 492 U.S. 937 (1989).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Lee v. Illinois*, 476 U.S. 530 (1986). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Mayes v. State*, 816 S.W.2d 79 (Tex.Crim.App. 1991). . . . . . . . . . . . . . . . . . . 28

*Montgomery v. State*, 810 S.W.2d 372 (Tex.Crim.App. 1991). . . . . . . . . . . . . . 24

*Neuman v. State*, 951 S.W.2d 538 (Tex. App. – Austin 1997, *no pet.*). . . . . . . . . 34

*Parra v. State*, 734 S.W.2d 281 (Tex.App. — San Antonio 1987, *pet. ref'd*). . . . 21

*Paulus v. State*, 633 S.W.2d 827 (Tex.Crim.App. 1982)(opinion on rehearing). . . 5

*Phelps v. United States*, 252 F.2d 49 (5th Cir. 1958).. . . . . . . . . . . . . . . . . . . . . 6

*Reed v. State*, 744 S.W.2d 112 (Tex.Crim.App. 1988). . . . . . . . . . . . . . . . . . . . . . 20

*Runkle v. State*, 484 S.W.2d 912 (Tex.Crim.App. 1972). . . . . . . . . . . . . . . . . . . . 21

*Santellan v . State*, 939 S.W.2d 155 (Tex.Crim .App. 1997). . . . . . . . . . . . . . . . 29

*Thomas v. State*, 166 Tex.Crim. 331, 313 S.W.2d 311 (1958). . . . . . . . . . . . . . . 21

*Tidrow v. State*, 916 S.W.2d 623 (Tex. App. – Fort Worth 1996, *no pet.*). . . . . . 6

*Umstead v. State,* 435 S.W.2d 156 (Tex.Crim.App. 1968).. . . . . . . . . . . . . . . . . 17

*Vernon v. State*, 841 S.W.2d 407 (Tex.Crim.App. 1992). . . . . . . . . . . . . . . . . . 27

*Villarreal v. State*, 576 S.W.2d 51 (Tex.Crim.App. 1978), *cert. denied*, 444 U.S. 885

(1979).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Walker v. State*, 615 S.W.2d 728 (Tex.Crim.App. 1981). . . . . . . . . . . . . . . . . . . . 7

*Welden v. State*, 10 Tex.Ct.App. 400 (1881). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Williams v. State*, 662 S.W.2d 344 (Tex.Crim.App. 1983).. . . . . . . . . . . . . . . . . 28

*Young v. State*, 159 Tex.Crim. 164, 261 S.W.2d 836 (1953). . . . . . . . . . . . . . . . 28

*Zuliani v. State*, 903 S.W.2d 812 (Tex.App. — Austin 1995, *pet. ref'd*). . . . . . . . 30

## CODES, RULES AND CONSTITUTIONAL PROVISIONS

U.S. CONST. AMEND. V. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

U.S. CONST. AMEND. XIV. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

TEX. CONST. ART. I, §13. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

TEX. CONST. ART. I, §19. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

TEX. CODE CRIM.PRO., art. 38.14 (West 1965).. . . . . . . . . . . . . . . . . . . . . . . 5

TEX. PENAL CODE, §19.03 (West 2013). . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

TEX. R. EVID. Rule 402. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

TEX. R. EVID. Rule 403. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23-28

TEX. R. EVID. Rule 404. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23-28

TEX.R.APP.PRO. 38. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

TEX.R.APP.PRO. 44.2(b). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

## OTHER SOURCES

Saverda, C.J., *Accomplices in Federal Court: A Case for Increased Evidentiary Standards*, 100 YALE L.J. 785, 790-791 (1990). . . . . . . . . . . . . . . . . . . . . . . . . 6

TO THE HONORABLE JUSTICES OF THE COURT OF APPEALS:

COMES NOW, Bruce Wayne Harkey, Appellant in this cause, by and through his attorneys of record, Richard Davis and Keith S. Hampton, and, pursuant to the provisions of TEX.R.APP.PRO. 38, *et seq*., files this brief on appeal.

## STATEMENT OF THE CASE

On March 6, 2013, Appellant was charged by indictment with capital murder. (Clerk's Record "CR," pp. 1-4). *See* TEX. PENAL CODE, §19.03 (West 2013). The one count, four-paragraph indictment alleged that Appellant committed murder in the course of kidnapping and burglary, murder of two persons, and murder with promise of remuneration. (CR, pp. 1-4). Appellant entered a plea of not guilty, but on April 29, 2014, a jury found him guilty of capital murder under two verdicts.

The jury returned a verdict of guilt under count one, paragraphs 1-3, i.e.: murder of Bonnie Harkey with promise of remuneration, murder of Karen Johnson and Bonnie Harkey, and murder of Bonnie Harkey in the course of burglary. The jury also returned a separate verdict of guilt under count one, paragraph 4, i.e.: murder of Karen Johnson in the course of kidnapping Bonnie Harkey. (CR, pp. 189; 191)(RR, Vol. 12, p. 61).

The death penalty having been waived, Appellant was sentenced to life without

parole in the Institutional Division of the Texas Department of Criminal Justice on April 29, 2014. (CR, pp. 193-196)(RR, Vol. 12, pp.64-65).

On May 13, 2014, Appellant timely filed his motion for new trial which was overruled on June 2, 2014. (CR, pp. 197-200; 202). On July 15, 2014, Appellant timely perfected his appeal. (CR, p. 203).

---

## ISSUES PRESENTED

**ISSUE NO. ONE: THE ACCOMPLICE WITNESSES' TESTIMONY WAS INSUFFICIENTLY CORROBORATED UNDER ARTICLE 38.14 OF THE CODE OF CRIMINAL PROCEDURE TO SUSTAIN A CONVICTION OF THE CAPITAL MURDER OF KAREN JOHNSON.**

**ISSUE NO. TWO: THE ACCOMPLICE WITNESSES' TESTIMONY WAS INSUFFICIENTLY CORROBORATED UNDER ARTICLE 38.14 OF THE CODE OF CRIMINAL PROCEDURE TO SUSTAIN A CONVICTION OF THE CAPITAL MURDER OF BONNIE HARKEY.**

**ISSUE THREE: THE TRIAL COURT ERRED IN ALLOWING THE STATE, DURING ITS CASE-IN-CHIEF, TO INTRODUCE EVIDENCE OF EXTRANEOUS ACTS OF SEEKING MULTIPLE MURDERS, CONTRARY TO RULES 403 AND 404(B) OF THE TEXAS RULES OF EVIDENCE.**

**ISSUE FOUR: THE TRIAL COURT ERRED IN ALLOWING THE STATE, DURING ITS CASE-IN-CHIEF, TO INTRODUCE EVIDENCE OF THE EXTRANEOUS ACT OF SOLICITING SOMEONE TO KILL BONNIE HARKEY BECAUSE THE STATE GAVE NO NOTICE OF ITS INTENT TO INTRODUCE SUCH EVIDENCE.**

## SUMMARY OF FACTS

Carl Pressley and Lillian King were charged with the murders of Bonnie Harkey and her caregiver, Karen Johnson. Pressley implicated Appellant. At trial, the prosecution relied on Pressley's and King's testimony as accomplice witness testimony. The State sought to corroborate the accomplice witness testimony through the testimony of King's mother, who recalled an exchange of money between Pressley and Appellant, phone records, and evidence that Appellant despised Bonnie Harkey. The State also introduced extraneous bad acts including an offer made to an inmate to kill other people, schemes to kill his ex-wives, and a previous plan to kill Bonnie Harkey.

## SUMMARY OF ARGUMENT

Pressley and King were the prosecution's star witnesses, who admitted committing murders of Karen Johnson and Bonnie Harvey. They also implicated Appellant in the murders. However, the prosecution failed to sufficiently link Appellant to any of these offenses with nonaccomplice evidence, as long required by law. Instead, the nonaccomplice evidence — primarily his disparaging remarks about

Bonnie Harkey and proof that he has a propensity for trying to enlist people to kill other people – does nothing to connect him with the murders committed by Pressley and King. Pressley's conversation with Appellant and all the phone records merely show their association. Because the State failed to establish the necessary connection between Appellant and any specific offense, the corroboration is insufficient and Appellant is entitled to an acquittal.

The propensity evidence used in an effort to corroborate the accomplice testimony was inadmissible under Rule 404(b) of the Texas Rules of Evidence. The evidence that Appellant had a propensity for enlisting people to kill other people cannot be justified by any of the exceptions permitted by the court's instructions. Thus, the trial court erred by admitting this extremely prejudicial evidence.

The State gave no notice that it would introduce testimony that Appellant admitted he offered a motorcycle to a guy in East Texas to kill Bonnie Harkey. The introduction of this extraneous offense evidence was also very prejudicial.

**ISSUE NO. ONE: THE ACCOMPLICE WITNESSES' TESTIMONY WAS INSUFFICIENTLY CORROBORATED UNDER ARTICLE 38.14 OF THE CODE OF CRIMINAL PROCEDURE TO SUSTAIN A CONVICTION OF THE CAPITAL MURDER OF KAREN JOHNSON.**

**ISSUE NO. TWO: THE ACCOMPLICE WITNESSES' TESTIMONY WAS INSUFFICIENTLY CORROBORATED UNDER ARTICLE 38.14 OF THE CODE OF CRIMINAL PROCEDURE TO SUSTAIN A CONVICTION OF THE CAPITAL MURDER OF BONNIE HARKEY.**

The centerpiece of the State's case was Carl Pressley and his girlfriend, Lillian King. Both Pressley and King testified extensively to the murders of Karen Johnson and Bonnie Harkey. (Vol. 7, pp. 207-280; Vol. 8, pp. 189-276). Pressley detailed how he personally killed Johnson, then Harkey, while King detailed her part as a party to Pressley's capital murders. They were therefore accomplices as a matter of law and it is necessary under law to corroborate their testimony. *See, e.g., Paulus v. State*, 633 S.W.2d 827, 843 (Tex.Crim.App. 1982)(opinion on rehearing).

Article 38.14 of the Code of Criminal Procedure provides:

> A conviction cannot be had upon the testimony of an accomplice unless ***corroborated by other evidence tending to connect the defendant with the offense committed;*** and the corroboration is not sufficient if it merely shows the commission of an offense.

TEX. CODE CRIM. PROC. art. 38.14 (West 1965)(emphasis added). This provision has existed since the original code of criminal procedure was enacted in 1856.

As accomplices, Pressley's and King's testimony is viewed with extreme

distrust. *See, e.g., Kunkle v. State*, 771 S.W.2d 435, 439 (Tex.Crim.App. 1986), *cert. denied*, 492 U.S. 937 (1989); *Carrillo v. State*, 591 S.W.2d 876, 882 (Tex.Crim.App. 1979); *Villarreal v. State*, 576 S.W.2d 51, 56 (Tex.Crim.App. 1978), *cert. denied*, 444 U.S. 885 (1979); *Tidrow v. State*, 916 S.W.2d 623, 631 (Tex. App. — Fort Worth 1996, *no pet.*).  As the Fifth Circuit once observed, "A skeptical approach to accomplice testimony is a mark of the fair administration of justice . . . . [A] long history of human frailty and governmental overreaching for conviction justifies distrust in accomplice testimony." *Phelps v. United States*, 252 F.2d 49, 52 (5th Cir. 1958).  *See also Lee v. Illinois*, 476 U.S. 530, 542 (1986)("[A] confession that incriminates an accomplice is so 'inevitably suspect' and 'devastating' that the ordinarily sound assumption that a jury will be able to follow faithfully its instructions cannot be applied.")(citing *Bruton v. United States*, 391 U.S. 123 (1968)).

Neither the federal courts nor Texas courts are alone in this regard.

Nearly all states view accomplice testimony with suspicion due to the belief that accomplices often implicate their co-conspirators in order to exculpate themselves.  As a result of this perceived unreliability, many states have enacted statutes mandating corroboration of an accomplice's testimony to sustain a conviction. Another has added the requirement by judicial decision.

Saverda, C.J., *Accomplices in Federal Court: A Case for Increased Evidentiary Standards*, 100 YALE L.J. 785, 790-791 (1990)(footnote omitted).  Under Texas law,

an accomplice witness is a discredited witness because his testimony alone cannot furnish the basis for the conviction, regardless how complete a case may be made out by him or how convincingly he conveys his own — and the accused's — guilt. *See Walker v. State*, 615 S.W.2d 728, 731 (Tex.Crim.App. 1981).

The test for sufficient corroboration of an accomplice witness' testimony is to eliminate from consideration the testimony of the accomplice witness and then examine the other evidence to ascertain whether it tends to connect the defendant with the offense. *See Burks v. State*, 876 S.W.2d 877, 887 (Tex.Crim.App. 1994), *cert. denied*, 513 U.S. 1114 (1995); *Edwards v. State*, 427 S.W.2d 629, 632 (Tex.Crim.App. 1968).

The usefulness of the accomplice witness rule is that it requires police and prosecution to gather other corroborating evidence independent of the word of an accomplice before formally proceeding against a person. Corroboration contributes to the reliability of allegations made by inherently suspect sources, namely accomplices in crime, and acts as a safeguard against perjury, false accusations, and the convictions of innocent persons. The rule helps guarantee a fair administration of justice and instills greater confidence in the outcome of trials based on such testimony. It also prohibits convictions based on little more than the word of admitted criminals.

The evidence which the prosecution sought to connect Appellant with the murder of Karen Johnson and Bonnie Harkey were his own remarks to various people about his hatred of Bonnie Harkey and his desire to see her – and others – die. The prosecution introduced no evidence which linked Appellant specifically to the murders, but instead relied upon the following evidence to connect Appellant to Pressley's murders.

## State's evidence purporting to connect Appellant to the Murders

A boy at the home of Bonnie Harkey called police and said his mother was down and not breathing on the afternoon of Sunday, March 25, 2012. (Vol. 7, pp. 157-159). San Saba Sheriff Brown responded and found the boy outside and Karen Johnson dead in the doorway. (Vol. 7, pp. 161-163). Bonnie Harkey was not there, so Brown initiated a search for her. (Vol. 7, pp. 165-178).

Brown also sought out Harkey's grandson, Carl Pressley. (Vol. 7, pp. 182-184). San Saba deputy Wilkerson was dispatched to the home of Bonnie Harkey. He also interrogated Carl Pressley and his girlfriend, Lillian King. (Vol, 8, pp. 23-85). Pressley and King confessed to killing Karen Johnson and Bonnie Harkey. (Vol. 7, pp. 191; 252)(Vol. 8, pp. 33-37). Harkey's body was ultimately located in a creek at an RV park at Hilltop Lakes in Leon County. (Vol. 9, pp. 211-214; 224-226).

Dallas County pathologist Jill Urban conducted an autopsy of Bonnie Harkey and determined she was killed by having her face held down in water. (Vol. 8, pp. 146-147). Deputy chief medical examiner Chundru testified that Karen Johnson was killed by mechanical asphyxiation. (Vol. 8, p. 20).

**Appellant is Interrogated**

Texas Ranger Andres De La Garza interrogated Appellant. (State's exhibit 109). Appellant denied involvement in the murders. (State's exhibit 108).

**Testimony of Loretta Waller, Lillian King's Mother**

Waller testified that Lillian and Carl stayed at her house from Thursday, March 22 through Saturday March 24. (Vol. 9, pp. 60-62). During Carl's stay, Loretta overheard Carl on the phone say "he needed $100, and it was brought to him. And then on another telephone call he wanted $250 to put in his bank account if he wanted to – wanted something done." (Vol. 9, p. 68). Carl said he was talking to Appellant. (Vol. 9, p. 74). Waller was unsure whether the conversation occurred on Friday night or Saturday morning. (Vol. 9, p. 70).

Carl later told Loretta he got $100 from Appellant:

I heard him on the phone telling him he needed $100, and he – the next

thing I know, a few minutes later, Bruce come by the house, and Carl went outside and met him. ... Carl went outside and talked to him. He come back in, smiling, and had money. I didn't see it physically giving it to him, no.

(Vol. 9, p. 69).

Lillian also heard Carl say later, "If you want this done, I need you to send me another $250." After he got off the phone, he turned and told me and Lillian that he was going to put to Carl – Bruce was going to put $250 in his bank account Monday."

(Vol. 9, p. 71).

**Appellant's Phone Records**

Analysis of Appellant's phone revealed no records of any communication from Thursday, March 22nd through March 24th. (Vol. 9, p. 189; State's exhibit 72). According to his cell phone records, Appellant called only Jennifer Harkey (Appellant's wife) and Jason Sandlin (an acquaintance) between March 22nd through March 27th. (State's exhibit 74). Most of the calls were made when the phone was in the Fort Worth area. (Vol. 9, p. 166). Appellant's cell phone was in the Fort Worth area on Saturday, March 24th. (State's exhibits 69; 71). There were many calls between Appellant and Jennifer Harkey, and between Pressley and Sandlin from March 22nd and March 27th. (State's exhibit 74).

**Attorney Spinks and the Family Dispute About Property**

Riley and Joan Harkey had two sons, Appellant and John Harkey. (Vol. 7, p. 65). In 1963, Joan and Riley divorced, and Riley married Bonnie Harkey. (Vol. 7, pp. 65-66). Bonnie Harkey's daughter, Connie Ballinger, adopted Carl Pressley. (Vol. 7, p. 66). Bonnie Harkey was Appellant's step-mother and Pressley's grandmother. (Vol. 7, pp. 66-67).

In March, 2011, Connie Ballinger died and the court appointed attorney Darrel Spinks as temporary guardian of Bonnie Harkey and her estate. (Vol. 7, pp. 60-62). Bonnie Harkey had been suffering from dementia, unable to manage her affairs and needed 24-hour care. (Vol. 7, p. 63). In August, 2011, Spinks became permanent guardian. (Vol. 7, p. 85).

The sale of certain land was contested between Connie Ballinger and the Harkey brothers, but came to a mediated settlement before Ballinger's death. (Vol. 7, pp. 73-74). However, Spinks did not approve of the settlement and when he changed the terms of the settlement, Appellant and his brother expressed animosity towards him. (Vol. 7, pp. 88-89). They ultimately agreed to sell the land for about $200,000, with Appellant receiving about half of the proceeds. (Vol. 7, pp. 89-92).

Spinks hired Appellant for the physical management of her estate, but fired him within a month on very bad terms. (Vol. 7, pp. 104-106). Spinks discovered

Appellant had permitted Pressley to live on the property near Bonnie Harkey. Spinks did not want Pressley around her, in light of Pressley's "history" and the restraining orders against Pressley. (Vol. 7, pp. 104-106).

Appellant repeatedly called Spinks to complain about Spinks' management and threatening litigation, and was hostile to Spinks. (Vol. 7, pp. 107-110; 132-133). Appellant also disagreed with Spinks regarding Bonnie Harkey's care. (Vol. 7, pp. 136-140). Spinks testified that Appellant called the Harkey Orchard his "legacy," and Spinks believed Spinks and Bonnie Harvey were interfering with it. (Vol. 7, p. 110).

On August 1, 2011, Appellant's brother signed an agreement with Tommy Lee Jones (the famous actor) to sell the Prichard orchard to Jones for over $574,000 with a closing date of April 23, 2012. (Vol. 7, pp. 97-99; 112; State's exhibit 13). In August, 2011, Spinks became a prosecutor and testified he received a telephone call from Jones who wanted to buy the property. (Vol. 7, pp. 99-102). Spinks refused and the deal fell through. (Vol. 7, pp. 100-103). Spinks' relationship with Appellant and his brother became more contentious. (Vol. 7, p. 103).

On August 8, 2011, Pressley received a $7500 check after the sale of other properties. (Vol. 7, pp. 95-96; State's exhibit 37).

Under Riley Harkey's will, the life estate of the Prichard Orchard, a swath of almost 95 acres near the San Saba river, would have gone to Carl Pressley. (Vol. 7,

pp. 72; 93; 115). This property was valued at about $500,000. (Vol. 7, pp. 145-146).

However, in May, 2011, Pressley executed a specialty warranty deed to Appellant and his brother, conveying Pressley's interest to them. (Vol. 7, pp. 93-95).

Upon Bonnie Harkey's death, Appellant and his brother would inherit the Harkeyville Orchard, valued at about $50,000. (Vol. 7, p. 145). They would also inherit the property at 907 West Commerce, valued at about $70,000, and the Home Place Orchard, valued at about $45,000. (Vol. 7, pp. 146-147).

Spinks said Appellant often referred to Bonnie Harkey as a whore and prostitute. (Vol. 7, p. 89). Spinks also said that both he and Appellant didn't think she had that long to live. (Vol. 7, pp. 152-153).


**Conversation with Justice of the Peace Leslie Dawson**

About two or three weeks before the murders, Appellant told Dawson:

And I don't even know how the conversation started or where we were, but he made the comment that – something had come up about Bonnie, and he said he wished the bitch was dead where he could get his part and go to Belize. He said that Jennifer didn't want to go, but she wanted – she'd stay here at the farm with the girls and raise them, but he said that he'd – that Belize had one of the best educational systems in the world, and he'd like to take them down there, but that's what he wanted to do.

(Vol. 9, p. 56-57).

**What Sharon Blossman Overheard**

Sharon Blossman, clerk of the Justice of the Peace, testified Judge Dawson had said he was sorry about Connie Ballinger's death and Appellant said, "I'm glad that bitch is gone and out of my way. She won't be causing me any more problems." (Vol. 9, p. 88).

**Sheriff Brown**

Appellant told Brown he "wished the old bitch would die." (Vol. 7, p. 194). Brown responded by telling him he thought his remark was inappropriate, "and he totally apologized. He said, 'You just don't understand. That lady killed my son, and she's ruining my inheritance." (Vol. 7, p. 194).

**Jason Sandlin**

After the murders, Sandlin told Appellant he was sorry that he had heard about his mother dying, and "he was like, 'Wait a minute, what,' you know, and like he didn't know anything about it. And he said that he was going to call the sheriff's department to do a welfare check on her." Appellant also remarked "nothing had happened to his grandmother [sic] because he would've been one of the first ones to be notified if it did." "Yeah, he was like, 'Don't play with me,' something about he

was going to open a bottle of Jack and celebrate, or something like that. In a joking manner." (Vol. 9, pp. 116-118).

There was one five-minute call between Appellant and Pressley on Sunday, March 25 at 10:35 a.m. (Vol. 9, p. 199).

**Remarks to Brandy Lebow**

San Saba tax office title clerk Brandy Lebow testified that Appellant came into the tax office to register on March 23, 2012. (Vol. 10, p. 36). Appellant told Lebow he believed Bonnie Harkey should be in a nursing home because she wasn't able to make sound decisions any more. He also said that he was ready to take control of his property. (Vol. 10, pp. 37-39). Appellant also said that she needed to die. (Vol. 10, p. 40).

**Jack Vaugn**

Vaugn testified that Appellant came into the Auto Part's store on March 23, 2012 and said he needed an embroidered ball cap, that he was going out of town and to a big golf tournament in the Dallas area, leaving early Saturday morning and returning late Sunday night. (Vol. 9, pp. 36-38). Appellant repeated himself about his trip. (Vol. 9, pp. 39-41). He asked Vaugn if he knew Bonnie Harkey, and

remarked that she was in bad shape.  (Vol. 9, pp. 42).

**Louann Taylor**

Louann Taylor, who worked for senior citizen services, testified that Appellant called the Friday before the weekend murders to let her know he was going to be out of town until Monday, just in case she needed to get in touch with him.   She found it odd because there was no need for her to get in touch with him.  (Vol. 10, pp. 77-78).

**Tommy Johnson tractor repair shop owner**

A few days before Bonnie Harkey's murder, Appellant and Pressley came into his shop.  Appellant said "he couldn't believe she didn't have the decency to die," and called her a bitch.  (Vol. 10, pp. 55-56).

Appellant also told several people in the shop "the same exact story. I mean it was just like he was repeating it to everybody. He said he going to – he was going to Fort Worth to play golf with his brother as he sometimes does," and used the phrase "as I sometimes do."  Johnson had never known Appellant to play golf.  (Vol. 10, pp. 56-57).  Appellant was also overheard asking someone on his phone about whether a job was still available.  (Vol. 10, pp. 57-58).

On the Thursday or Friday before the weekend murders, Appellant appeared at the shop well- dressed and remarking, "I need to get out of town" and "I'm behind schedule." (Vol. 10, p. 58).

The Monday after the murders, Appellant encountered Johnson and "said that he had talked to a police officer, and they had told him that a 70-some-odd-year-old lady had been killed." (Vol. 10, p. 60). Appellant then asked Johnson about his (Johnson's mother), then asked, "Well, what's going on." Then he asked Johnson, "Are you sure your mother's all right?" (Vol. 10, p. 60). He asked him three different times if Johnson's mother was okay. (Vol. 10, pp. 58-60).

**Parolee Pat Pierce and the Jail Conversation**

Pat Pierce, a parolee with a theft conviction and jailed for possession of methamphetamine, testified he met Appellant in the Comanche County Jail. (Vol. 10, pp. 82-85). According to Pierce, Appellant offered him a Harley motorcycle to kill some people and that it would help him out on his case. He complained that Dick Miller and Jim Childress were selling his property, and that Sheriff Steve Boyd and Les Dawson were threatening his wife by asking her what she knew about the murders. (Vol. 10, pp. 86-91). He said they needed killing. (Vol. 10, p. 86).

Appellant had offered a motorcycle to a guy from East Texas to kill Bonnie

Harkey. (Vol. 10, p. 94).

Appellant also "said he talked to Carl about somebody disappearing for seven years, they would pronounce them legally dead, and him and Carl would have it made on the ranch." (Vol. 10, p. 97). Appellant said that Carl Pressley's mother was supposed to get what Carl Pressley was going to get, but she died before she was supposed to," and that Appellant got Pressley's rights. (Vol. 10, pp. 97-100).

## The Silencer and Appellant's Ex-Wives

### Nurse David Rube

When Appellant was a nursing home administrator, he hired Rube as a nurse. (Vol. 10, pp. 150-153). In 2003, Appellant asked Rube to kill his estranged wife, Kami Harkey. (Vol. 10, pp. 156). Appellant and Rube discussed poisons and the use of a .22 to kill her, and identified locations where it could be done. (Vol. 10, pp. 156-158). Appellant also suggested she be killed up close with a .44. (Vol. 10, pp. 158-159). Appellant obtained a silencer for the .22. (Vol. 10, pp. 158-160).

Appellant also wanted Rube to kill another ex-wife living in Oklahoma, and offered to supply Rube with a vehicle and an alibi. (Vol. 10, pp. 160-161).

Appellant told Rube he couldn't commit the murders himself and didn't want

to incriminate himself. (Vol. 10, p. 166). Rube did not believe him to be serious at first, but eventually believed Appellant was serious. (Vol. 10, pp. 162-163).

**Hank Powell**

Powell was a maintenance supervisor at the nursing home where Appellant worked as an administrator in 2003. (Vol. 10, pp. 173-174). Appellant asked Powell to make a silencer for a .22 automatic rifle. (Vol. 10, pp. 174). He told Powell he wanted the silencer to be used to kill his ex-wife, Kami Harkey. (Vol. 10, p. 175).

Powell contacted the police and pretended to go along with the preparation of a silencer. (Vol. 10, pp. 176-178). He recorded his conversations. (State's exhibit 114).

**Ranger Linderman and Deputy Boswell**

Texas Ranger Matt Linderman observed Appellant receive the silencer and saw Appellant put it in his vehicle. (Vol. 10, pp. 182-186). Deputy Matt Boswell had a conversation with Appellant which was recorded. (Vol. 10, pp. 142-147)(State's exhibit 112).

## Argument and Authorities

The well-established test for weighing the sufficiency of this corroborative evidence is to eliminate from consideration the testimony of the accomplice witnesses, then examine the remaining evidence to ascertain whether there is evidence which "tends to connect" the accused with the offense, in this case, with the murders of Karen Johnson and Bonnie Harkey. *See Reed v. State*, 744 S.W.2d 112, 125 (Tex.Crim.App. 1988). Accomplices cannot corroborate each other. *Fields v. State*, 426 S.W.2d 863 (Tex.Crim.App. 1968). Thus, the testimony of Pressley and King is eliminated from consideration.

The phrase "tending to connect" has been interpreted by the Court of Criminal Appeals to mean, "to serve, contribute or conduce in some degree or way . . . to have a more or less direct bearing or effect" on a connection and, while not contemplating conjecture, "has a tendency to prove the averments in the indictment." *Holladay v. State*, 709 S.W.2d 194 (Tex.Crim.App. 1986)(quoting *Boone v. State*, 90 Tex.Cr.R. 374, 235 S.W. 580 (Tex.Crim.App. 1922)(defining the word "tend")). Thus, the issue here is whether the remarks and evidence of animosity regarding Bonnie Harkey tend to connect Appellant with the murder of Karen Johnson and Bonnie Harkey.

As the Court of Criminal Appeals has repeated:

The accomplice may state any number of facts, and these facts may all

be corroborated by the evidence of other witnesses; still, if the facts thus corroborated do not tend to connect the defendant with the crime, or if they do not point pertinently to the defendant as the guilty party or as a participant, this would not be such corroboration as is required by the code.

*Umstead v. State,* 435 S.W.2d 156 (Tex.Crim.App. 1968)(quoting *Welden v. State*, 10 Tex.Ct.App. 400 (1881). *See also Runkle v. State*, 484 S.W.2d 912 (Tex.Crim.App. 1972).

None of the nonaccomplice evidence actually links Appellant to either murder. "[C]ircumstances [which] merely raise a suspicion" of a defendant's participation in the offense "do not meet the requirements of the law." *Thomas v. State*, 166 Tex.Crim. 331, 313 S.W.2d 311 (1958); *Boone v. State, supra*. There is certainly sufficient evidence to link Appellant with *Pressley* – they were related. But the law requires the prosecution to sufficiently link a defendant *to the offense*. *Umstead, supra*.

Cases in which the defendant's own statements have been held to be sufficient corroboration highlight the nature of the necessary connection of the accused with the crime for which he is on trial. In *Gandy v. State*, 835 S.W.2d 238, 241 (Tex. App. — Houston [1st Dist.] 1992, *pet. ref'd*), for example, the nonaccomplice evidence which the appellate court found to sufficiently link the defendant to the aggravated robbery of a restaurant was the eyewitness account of a bystander and the defendant's own

statement that he was the getaway driver of that robbery. Likewise in *Parra v. State*, 734 S.W.2d 281 (Tex.App. — San Antonio 1987, *pet. ref'd*), the defendant's statement that she asked one of the accomplices, "Germaine," to "do Jose [Parra]in," in exchange for her car, and her admission that she helped the accomplices, and that "Germain" got her car shortly after the murder, all constituted sufficient corroboration to the accomplice's testimony. As these cases show, far greater clarity and stronger connection is required than the nonexistent nonaccomplice proof in the present case.

None of the nonaccomplice evidence actually connects Appellant to either murder. While Appellant's remarks convey many things, they do not provide an independent connection between Appellant and the murder of Karen Johnson or Bonnie Harkey. His expressions regarding the killing of two lawyers, a judge and sheriff do no more to connect him with the murders of Karen Johnson or Bonnie Harkey than the evidence of his efforts to kill two of his ex-wives. Pierce's testimony that Appellant offered someone from East Texas to kill Bonnie Harkey does not connect Appellant to Pressley and King's murder of Karen Johnson or Bonnie Harkey. The testimony of Pressley and King was therefore not sufficiently corroborated under Article 38.14.

**ISSUE THREE: THE TRIAL COURT ERRED IN ALLOWING THE STATE, DURING ITS CASE-IN-CHIEF, TO INTRODUCE EVIDENCE OF EXTRANEOUS ACTS OF SEEKING MULTIPLE MURDERS, CONTRARY TO RULES 403 AND 404(B) OF THE TEXAS RULES OF EVIDENCE.**

The State gave a detailed account of its intent to introduce various extraneous bad acts and offenses in its *Trial Brief*. (CR, pp. 66-156). Counsel for Appellant filed a detailed *Brief in Response*. (CR, pp. 157-163). Ultimately, the trial court admitted evidence that Appellant sought to kill the sheriff, justice of the peace, and two lawyers, and two ex-wives.

Over the defense's running objection under Rules 404(b) and 403 of the Texas Rules of Evidence, the trial court admitted the testimony from Pat Pierce for the limited purpose of proving "a continuing scheme, as evidence of motive, or as evidence of intent to engage in a conspiracy[.]" (Vol. 10, pp. 97). According to Pierce, Appellant offered him a Harley motorcycle to kill Dick Miller and Jim Childress in retaliation for selling his property, and to kill Sheriff Steve Boyd and Justice of the Peace Les Dawson in retaliation for threatening his wife by asking her what she knew about the murders of Karen Johnson and Bonnie Harkey. (Vol. 10, pp. 86-90).

The trial court also admitted the testimony of David Rube, Hank Powell and Matt Lindermann for the limited purpose of proving a scheme, as rebuttal of unnamed

defensive theories, or as evidence of intent to engage in a conspiracy. (Vol. 10, pp. 155-156) (Vol. 10, p. 179). Appellant asked Rube to kill two of his ex-wives, and asked Powell to create a silencer for a .22 automatic rifle to be used to kill his ex-wife, Kami Harkey. (Vol. 10, pp. 158-160) (Vol. 10, pp. 173-178) (State's exhibit 114).

Evidence is "relevant" if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tex.R.Evid. 401. Evidence which is not relevant is inadmissible. Tex.R .Evid. 4 02. Evidence of "other crimes, wrongs, or acts," although not admissible to prove the defendant's character conformity, "may, however, be admissible" if it has relevance apart from its tendency "to prove the character of a person in order to show that he acted in conformity therewith." Tex.R.Evid. 404(b). Relevant evidence must be excluded if its probative value is substantially outweighed by its prejudicial effect. Tex.R.Evid. 403.

In *Montgomery v. State*, 810 S.W.2d 372, 386 (Tex.Crim.App. 1991)(opinion on rehearing), the Court of Criminal Appeals discussed the interplay of the above rules and determined that, after the proponent has offered the extraneous offense and the opponent has lodged an objection against it, the proponent must then persuade the trial court that the evidence has relevance apart from character conformity. *Id*. at 387.

If the trial court concludes the evidence is relevant to prove some elemental fact, as illustrated by the nonexhaustive list of "purposes" set forth in Rule 404(b), the opponent must further object based on Rule 403. *Id*. at 387-388. The court must then conduct a balancing test to determine whether the probative value of the evidence is outweighed by its prejudicial effect. *Id*. at 389-390.

The rules favor admitting all relevant evidence; however, the proponent of such evidence must show a corresponding need for it apart from character conformity. *Id*. at 389-390. The trial court's duties under Rule 403 are clear: "The court would do well to inquire of the opponent what his view of the prejudice is. On the other hand, the court should ask the proponent to articulate his need. But once the rule is invoked, 'the trial judge has no discretion as to whether or not to engage in the balancing process.'" *Id*. at 389 (internal citations omitted).

The United States Supreme Court has explained the policy of the inadmissibility of character conformity evidence:

> Courts that follow the common-law tradition almost unanimously have come to disallow resort by the prosecution to any kind of evidence of a defendant's evil character to establish a probability of his guilt. Not that the law invests the defendant with a presumption of good character, but it simply closes the whole matter of character, disposition and reputation on the prosecution's case-in-chief. The state may not show defendant's prior trouble with the law, specific criminal acts, or ill name among his neighbors, even though such facts might logically be persuasive that he is by propensity a probable perpetrator of the crime. The inquiry is not

rejected because character is irrelevant; on the contrary, it is said to weigh too much with the jury and to so overpersuade them as to prejudge one with a bad general record and deny him a fair opportunity to defend against a particular charge. The overriding policy of excluding such evidence, despite its admitted probative value, is the practical experience that its disallow ance tends to prevent confusion of issues, unfair surprise and undue prejudice.

*Michelson v. United States*, 335 U.S. 469, 475 -476 (1948)(citations omitted).


## I. Evidence of the Extraneous Acts involving Plans to Kill Other People was Character Propensity Evidence, and Inadmissible under Rule 404.

Appellant's plans and efforts to kill two ex-wives, a sheriff, a judge and two lawyers as proof that he was a party to the murder of Karen Johnson and Bonnie Harkey constituted character conformity evidence, which is inadmissible under Rule 404:

(a) CHARACTER EVIDENCE GENERALLY. Evidence of a person's character or a trait of his character is not admissible for the purpose of proving that he acted in conformity therewith on a particular occasion[.]

(b) OTHER CRIMES, WRONGS, OR ACTS. Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, provided, upon timely request by the accused, reasonable notice is given in advance of trial of intent to introduce in the State's case in chief such evidence other than that arising in the same transaction.

Tex.R.Evid. Rule 404.

The sole issue in the case was the corroboration of testimony of the accomplices, Pressley and King. This extraneous evidence does nothing to prove Appellant had a motive to kill Bonnie Harkey or Karen Johnson. It does nothing to prove any conspiracy or continuing scheme to kill these two women. There is no defensive theory that is rebutted with this extensive extraneous evidence. It is nothing more than character conformity evidence.

"The extraneous acts between appellant and [third parties] does not help prove appellant committed the charged offenses except under a propensity rationale, for which they are not admissible." *Boutwell v. State*, 719 S.W.2d 164, 180 (Tex.Crim.App. 1985), *limited on other grounds*, *Vernon v. State*, 841 S.W.2d 407 (Tex.Crim .App. 1992). *See also Kelly v. State*, 828 S.W.2d 162 (Tex.App. — Waco 1992)("Evidence of extraneous offenses involving conduct between the defendant and third parties is exactly what the rule [404] forbids"); *Cruz v. State*, 737 S.W.2d 74 (Tex.App. — San Antonio 1987)("evidence of extraneous acts by the appellant against third parties does not help prove the appellant committed the charged offense except under a propensity rationale"). In this case, the extraneous character evidence simply proves that Appellant had a propensity for enlisting people to kill other people – precisely what Rule 404 forbids.

An accused person has the right not to be tried as a criminal generally. *See,*

*e.g., Williams v. State*, 662 S.W.2d 344, 346 (Tex.Crim.App. 1983); *Young v. State*, 159 Tex.Crim. 164, 261 S.W.2d 8 36, 837 (1953)("accused person is entitled to be tried on the accusation made in the State's pleading and not on some collateral crime, or for being a criminal generally."). Rule 404 is meant to protect this right and thereby fulfill due process:

> Evidence of a defendant's bad character traits possesses such a devastating impact on a jury's rational disposition towards other evidence, and is such poor evidence of guilt, that an independent mandatory rule was created expressly for its exclusion. See Rule 404. See also Imwinkelreid, Uncharged Prior Misconduct, Sec. 1.02 (1984) ("Evidence of uncharged misconduct strips the defendant of the presumption of innocence.").

*Mayes v. State*, 816 S.W.2d 79, 86 (Tex.Crim.App. 1991). *See also Galvez v. State*, 962 S.W.2d 203 (Tex.App. — Austin 1998, *pet. ref'd*). Here, the State effectively won a conviction through proof of his predisposition to enlist people to kill other people does not like.

## II. The Extraneous Evidence was Irrelevant under Rule 403.

Rule 403 provides:

> Although relevant, evidence may be excluded if its ***probative v alue is substantially outweighed by the danger of unfair prejudice***, ***confusion of the issues***, or misleading the jury, or by the considerations of undue delay, or needless presentation of cumulative evidence.

Tex.R.Evid. 403. From the plain language of this Rule, it is the *risk* of confusion and unfair prejudice which is balanced against the logical relevance of this extraneous evidence.

Factors which should go into the Rule 403 balancing test include:

(1) how compellingly the extraneous offense evidence serves to make a fact of consequence more or less probable — a factor which is related to the strength of the evidence presented by the proponent to show the defendant in fact committed the extraneous offense;

(2) the potential the other offense evidence has to impress the jury "in some irrational but nevertheless indelible way;"

(3) the time the proponent will need to develop the evidence, during which the jury will be distracted from consideration of the [charged] offense;

(4) the force of the proponent's need for this evidence to prove a fact of consequence, i.e., does the proponent have other probative evidence available to him to help establish this fact, and is this fact related to an issue in dispute.

*Santellan v . State*, 939 S.W.2d 155, 169 (Tex.Crim .App. 1997).

Pierce's testimony did not advance any fact of consequence in this case except to introduce Appellant's bad character and to prove precisely what the propensity rule precludes: if he sought to enlist people to kill those he does not like, he surely hired Pressley to kill Karen Johnson and Bonnie Harkey.  If he sought to employ others to kill two ex-wives, two lawyers, a judge and sheriff, then he must have hired Pressley to commit two murders.  *See Zuliani v. State*, 903 S.W.2d 812, 826-827 (Tex.App. —

Austin 1995, *pet. ref'd*). The purpose of this extraneous character evidence was limited to motive, scheming and conspiring, and later, the rebuttal of unexplained "defensive theories," likely confusing to a jury considering whether Appellant was a party to Pressley's murders, and unfairly prejudicing Appellant. The evidence distracted the jury from the central issue, and did nothing to prove the charged offense except under a forbidden propensity rationale. Its admission was therefore trial court error.

**III. Harm Analysis**

As the Court of Criminal Appeals has held, "it is the responsibility of the appellate court to assess harm after reviewing the record and that the burden to demonstrate whether the appellant was harmed by a trial court error does not rest on the appellant or the State." *Johnson v. State,* 43 S.W.3d 1, 5 (Tex.Crim.App. 2001). Under Rule 44.2 of the Rules of Appellate Procedure, constitutional error that is subject to harmless error review requires this Court to reverse the conviction unless the court determines beyond a reasonable doubt that the error did not contribute to the conviction. Tex.R.App.Pro. 44.2.

Because the extraneous offense rule is meant to ensure a fair trial, its violation implicates due process and due course of law, and the introduction of propensity

evidence can therefore constitute an error constitutional in nature. *See* U.S. Const. V, XIV; Tex. Const. art. I, §§13 & 19. Errors constitutional in nature are reviewed under the harmless error standard. *See* Tex.R.App. Pro. Rule 44.2(a). Harmless error analysis focuses upon the error rather than the propriety of the outcome of the trial, ensures the fairness of the trial and the integrity of the process, and gauges the error's probable impact upon the jury in order to decide whether it contributed to the conviction or punishment. *See Harris v. State*, 790 S.W.2d 568, 585-87 (Tex.Crim.App. 1989). Efforts to commit extraneous murders was highly prejudicial propensity evidence. It is difficult to conceive of evidence more prejudicial in a capital murder case in which the jury is asked to decide whether there was proof beyond a reasonable doubt that Appellant was criminally responsible for the murder of Karen Johnson or Bonnie Harkey. Having learned of Appellant's other schemes to kill, jurors likely did not care.

**ISSUE FOUR: THE TRIAL COURT ERRED IN ALLOWING THE STATE, DURING ITS CASE-IN-CHIEF, TO INTRODUCE EVIDENCE OF THE EXTRANEOUS ACT OF SOLICITING SOMEONE TO KILL BONNIE HARKEY BECAUSE THE STATE GAVE NO NOTICE OF ITS INTENT TO INTRODUCE SUCH EVIDENCE.**

Pursuant to the Rules of Evidence, Appellant's counsel sought notice of any extraneous bad acts the State intended to introduce in its case-in-chief. (CR, pp. 24-25). The State gave a detailed account of its intent to introduce various extraneous bad acts and offenses in its *Trial Brief.* (CR, pp. 66-156). Nowhere mentioned was the State's intent to introduce its most damning extraneous bad act – testimony that Appellant had offered a motorcycle to a guy from East Texas to kill Bonnie Harkey. (Vol. 10, pp. 92-94).

The State produced through Pat Pierce's testimony that Appellant told him he offered a motorcycle to a guy from East Texas to kill Bonnie Harkey. (Vol. 10, p. 94). The witness confirmed the unnoticed nature of his testimony:

Q.   [A]t that point in time you didn't bring up the fact that he had indicated any intent to kill Bonnie Harkey but you brought that up today; is that correct?

A.   Yes, sir.

Q.   Okay. Can you tell the jury why you didn't the first time and why you have now?

A.   I just – it just led up to it.

(Vol. 10, p. 101).

> Q. And, again, today's the only day you brought up Bonnie's name. You didn't bring it up in the past?

> A. Yes, sir.

(Vol. 10, p. 104).

When Pierce first began to testify about the offer to kill Bonnie Harkey, counsel for the defense objected. (Vol. 10, pp. 91-93). The prosecution acknowledged that while it had given notice of Pierce's previous claims that Appellant sought to enlist a guy from East Texas to kill someone, he had never before said it was Bonnie Harkey. (Vol. 10, pp. 95-96). Appellant objected on the basis of lack of notice, but the trial court overruled the objection. (Vol. 10, pp. 94-95).

Rule 404(b) of the Texas Rules of Evidence requires the prosecution to provide reasonable notice before trial of its intent to introduce such extraneous evidence. The purpose of the rule is to prevent surprise. *Hayden v. State*, 66 S.W.3d 269 (Tex.Crim.App. 2001). This Court has held that morning-of-trial notice to a request made six weeks earlier was not reasonable. *Neuman v. State*, 951 S.W.2d 538, 540 (Tex. App. – Austin 1997, *no pet*.). This circumstance is worse – there was no notice whatsoever that Appellant had sought to kill Bonnie Harkey. Surprising but highly prejudicial evidence was introduced. For any juror weighing whether the State had

proven guilt beyond a reasonable doubt, proof that Appellant had claimed to have planned to kill Bonnie Harkey through another person was surely convincing evidence of Appellant's guilt.

## PRAYER FOR RELIEF

*WHEREFORE, PREMISES CONSIDERED*, Appellant respectfully prays that

this Court reverse the conviction and remand the cause to the trial court with an order

to enter a judgment of acquittal; or alternatively, reverse the conviction and remand

the cause for a new trial.


Respectfully submitted,



RICHARD D. DAVIS
Attorney at Law
State Bar No. 05537100
P. O. Box 398
Burnet, Texas 78611
(512) 756-5117
rdd@austin.twcbc.com

KEITH S. HAMPTON
Attorney at Law
State Bar No. 08873230
1103 Nueces Street
Austin, Texas 78701
(512) 476-8484 (o)
(512) 477-3580 (f)
(512) 762-6170 (c)
keithshampton@gmail.com

## CERTIFICATE OF COMPLIANCE

By affixing my signature, I hereby certify that this document contains a word count of 8289 and therefore complies with Tex.R.App.Proc. 9.4(i)(3).

RICHARD D. DAVIS

## CERTIFICATE OF SERVICE

By affixing my signature above, I hereby certify that a true and correct copy of the foregoing APPELLANT'S BRIEF, was delivered electronically or via the United States Postal Service to District Attorney's Office, 33rd and 424th Judicial District 1701 E. Polk Street, Suite 24, Burnet, Texas 78611, on May 15, 2015.

RICHARD D. DAVIS